**UNITED STATES of America, Appellee,**

v.

**Julio Alberto TEJADA, Defendant–Appellant,**

**Mancebo, et al., Defendants.**

**UNITED STATES of America, Appellant,**

v.

**Winston CABRERA, Defendant–Appellee.**

Nos. 19, Docket 91–1071,
43, Docket 91–1119.

United States Court of Appeals,
Second Circuit.

Argued Sept. 19, 1991.

Decided Feb. 21, 1992.

Louis R. Aidala, New York City, for defendant-appellant Tejada.

Nancy Northup, Asst. U.S. Atty., S.D.N.Y., New York City (Otto G. Obermaier, U.S. Atty. and Mary Lee Warren, Asst. U.S. Atty., S.D.N.Y., of counsel), for appellant and appellee U.S.

Henriette D. Hoffman, Legal Aid Soc., Federal Defender Services Appeals Unit, New York City, for defendant-appellee Cabrera.

Mark F. Pomerantz and Robert Penchina, Rogers & Wells, New York City, for amici curiae New York Council of Defense Lawyers and New York Crim. Bar Ass'n.

Before VAN GRAAFEILAND, MESKILL and MAHONEY, Circuit Judges.

MESKILL, Circuit Judge:

These are consolidated appeals from judgments of conviction entered in the United States District Court for the Southern District of New York. Defendant Julio Alberto Tejada appeals from a judgment of conviction entered following a five day jury trial before Walker, *J*. The jury found that Tejada conspired to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. § 846 and that he possessed with the intent to distribute cocaine in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(B). The government is the appellant in the second case. That appeal is from a judgment of conviction entered following Winston Cabrera's plea of guilty to conspiring to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. § 846 before Martin, *J. See United States v. Cabrera*, 756 F.Supp. 134 (S.D.N.Y.1991). Because both cases arise out of the same transaction and raise the same issue regarding the use of illegally seized evidence at sentencing, we granted the government's motion to consolidate the appeals.

We also consider two other issues that Tejada raises and one additional issue that the government raises. Tejada asserts that the evidence against him was insufficient to support a conviction and that the district court erred by permitting certain rebuttal testimony. The government in its appeal challenges Judge Martin's ruling that the amount of narcotics that the conspirators actually delivered determined the scope of the conspiracy for purposes of calculating the United States Sentencing Guidelines (Guidelines) base offense level.

We affirm Tejada's judgment of conviction. We disagree with the district court's ruling that the amount of drugs Cabrera delivered determined the base offense level under the Guidelines. We hold that a sentencing judge should consider illegally obtained evidence where it was not seized expressly to enhance the sentence. Thus, we also remand for a determination of whether suppressed evidence was seized expressly to enhance Cabrera's sentence.

## BACKGROUND

On November 13, 1989, Detective Miguel Monge of the New York Drug Enforcement Task Force (NYDETF) met with an alleged drug dealer, Johnny Mancebo, who agreed to sell the detective two kilograms of cocaine. This deal, and a similar one a month later, fell through because Mancebo or people connected with him detected unmarked police cars watching them. Detec-

tive Monge again attempted to purchase two kilograms of cocaine from Mancebo on June 5, 1990. Mancebo arranged a meeting that evening between defendant Cabrera and Detective Monge.

As prearranged, Detective Monge and another undercover detective met with Cabrera to purchase two kilograms of cocaine, but when Cabrera informed the detectives that he could produce only 1.91 kilograms of cocaine Monge became angry. Cabrera attempted to mollify Monge by placing a telephone call in order to make up the deficiency. Cabrera then took the detectives to the area of 196th Street and Jerome Avenue in the Bronx.

On arrival, Monge told Cabrera to find Mancebo. Cabrera responded by leaving the car and approaching defendant Tejada and another man, Julio Pumerol, who were standing on the sidewalk looking up and down the block. After speaking with Tejada, Cabrera returned to the car and told Detective Monge that he could deliver the full two kilograms and that Mancebo was in the area.

After telling Detective Monge that he was going to get the cocaine, Cabrera walked up the block into the apartment building at 2800 Jerome Avenue, out of the sight of backup agent Detective William J. O'Flaherty, who was conducting surveillance. Within minutes, Cabrera emerged carrying a floral patterned box and rejoined Tejada and Pumerol on the sidewalk.

After talking among themselves, Cabrera, Tejada and Pumerol approached Detective Monge's vehicle. There, Tejada cautioned Cabrera to complete the transaction in a less public place, preferably around the corner. As Monge followed Tejada's suggestion and moved the vehicle around the corner, Cabrera opened the box and showed the cocaine to the detectives. Acting on a prearranged signal, other NY-DETF officers then moved in and arrested Cabrera, Tejada and Pumerol and seized the 1.989 kilograms of cocaine that the flowered box contained. On Tejada's per-

son, the detectives found, among other papers, a money order and a receipt for rent for apartment 3k at 2800 Jerome Avenue (although neither was in Tejada's name) and business cards inscribed with Mancebo's beeper number. What occurred next between Detective O'Flaherty and Tejada gave rise to the Fourth Amendment issue in this case.

Detective O'Flaherty testified at the evidentiary hearing on Tejada's motion to suppress as follows. Cabrera waived his *Miranda* rights and told O'Flaherty that he had retrieved the cocaine from apartment 3k at 2800 Jerome Avenue. Cabrera also disclosed to Detective O'Flaherty that no one was in apartment 3k, but that cocaine and a gun remained there in a closet. When O'Flaherty asked Cabrera if he had keys to apartment 3k, Cabrera gave them to the detective. O'Flaherty testified further that Cabrera willingly signed a DEA consent-to-search form and hand wrote his consent to a search of the apartment.

Detective O'Flaherty also testified that after leaving Cabrera in custody outside 2800 Jerome Avenue he joined other NY-DETF officers in the third floor hallway of 2800 Jerome Avenue. After showing his supervisor the consent-to-search forms and testing Cabrera's keys in apartment 3k's doorlock, Detective O'Flaherty heard voices that he believed emanated from inside the apartment. Another officer then used a battering ram to open the door. Inside, the detectives found additional cocaine and a loaded gun, but no people.

In June 1990, the government filed a three count indictment charging that Mancebo, Cabrera and Tejada had conspired to distribute and possess with intent to distribute approximately two and one-quarter kilograms[1] of cocaine, that they had distributed and possessed the cocaine and that they had used a firearm during and in relation to drug trafficking in violation of federal law.

---

1. Although the indictment charged two and one-quarter kilograms, the evidence only supported a charge of two kilograms. Prior to trial, Judge

Martin suppressed evidence of the additional quarter kilogram of cocaine as being the fruit of an illegal search.

Prior to trial,[2] Tejada moved to suppress various items, including the narcotics and loaded firearm found during the search of apartment 3k. Judge Martin granted Tejada's motion in a memorandum order. Finding that Cabrera did not consent to the search, he expressed disbelief that an officer with keys to an apartment would have employed a battering ram. Responding to Judge Martin's ruling, the government dropped the firearms charge.

Soon thereafter, Tejada's case was transferred for trial before Judge Walker. The trial lasted five days, concluding with a jury verdict convicting Tejada on both remaining counts of the indictment.

At sentencing, Judge Walker considered the suppressed evidence and increased defendant Tejada's sentence in accordance with the Guidelines, stating that "I must consider the gun." Conversely, at Cabrera's sentencing, Judge Martin refused to consider the gun, holding that, as a matter of law, a court may not consider illegally seized evidence in calculating a Guidelines sentence. In his view, pre-Guidelines precedent no longer applied. 756 F.Supp. at 135. Moreover, Judge Martin held that the amount of drugs delivered rather than the amount that the conspirators had agreed to distribute defined the scope of the conspiracy when calculating the Guidelines base offense level.

On appeal, the various parties and *amici* disagree as to the propriety of considering at sentencing evidence obtained in violation of the Fourth Amendment. The government also appeals from Judge Martin's ruling that the object of the conspiracy for Guidelines purposes was the quantity that the conspirators actually delivered. Tejada, for his part, additionally objects to the sufficiency of the evidence against him and to Judge Walker's having allowed the government to have presented rebuttal evidence that exceeded the scope of direct examination.

**2.** Tejada was the only one of those involved who actually faced a trial: Cabrera pleaded guilty to one count of the government's three count indictment, and the government never instituted

## DISCUSSION

### A. Considering Suppressed Evidence at Sentencing

#### 1. *The Fourth Amendment and Exclusion*

■ Although it remains clear that illegally seized evidence may not be used in the prosecution's case-in-chief, societal interests have led the Supreme Court narrowly to cabin the reach of the exclusionary rule. The issue before us now is whether the exclusionary rule prevents judges from considering illegally obtained evidence at sentencing.

Prior to the Guidelines, we answered this question in the negative. *See United States v. Schipani*, 435 F.2d 26, 28 (2d Cir.1970), *cert. denied*, 401 U.S. 983, 91 S.Ct. 1198, 28 L.Ed.2d 334 (1971). In *Schipani*, we stated that "[w]here illegally seized evidence is reliable and it is clear, as here, that it was not gathered for the express purpose of improperly influencing the sentencing judge, there is no error in using it in connection with fixing sentence." 435 F.2d at 28. Because the Guidelines remove a great deal of judicial discretion and the consideration of illegally seized evidence at sentencing is likely to result in increased penalties, the consideration of such evidence at sentencing now takes on greater significance. Accordingly, we now will examine whether under the Guidelines sentencing judges may consider illegally seized evidence.

■ A search that violates the Fourth Amendment does not confer on its victim a personal right to suppression of the illegally seized evidence. *See Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960) (exclusionary rule "is calculated to prevent, not to repair"); *see also Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976) (exclusionary rule "is not a personal constitutional right"); *United States v. Calandra*, 414 U.S. 338, 347–48,

charges against Pumerol. Despite his having been the focus of the government's inquiry, authorities had not apprehended Mancebo at the time of Tejada's trial.

94 S.Ct. 613, 619–20, 38 L.Ed.2d 561 (1974) (exclusionary rule is not "a personal constitutional right of the party aggrieved"). Although a victim of an illegal search benefits from the exclusion of evidence that links him to an illegal act, the admission of the evidence does not itself invade the privacy of the search victim, which is a *fait accompli*. We suppress evidence only because doing so will deter future violations of the Fourth Amendment. *See, e.g., Calandra*, 414 U.S. at 347–48, 94 S.Ct. at 619–20. In fact, the Supreme Court has refused to apply the exclusionary rule for Fourth Amendment violations where deterrence will not ensue. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (exclusionary rule inapplicable if officers relied in good faith on warrant); Dripps, *Living With* Leon, 95 Yale L.J. 906, 935 (1986) (Dripps) ("The *Leon* majority announced that [the Fourth Amendment] could be violated but that nothing would happen."); *see also Illinois v. Krull*, 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (exclusionary rule inapplicable when officers act in objectively reasonable reliance on a statute).

Moreover, the Supreme Court has instructed us not to suppress evidence solely because doing so might deter illegal searches. Rather, the likelihood of increased deterrence must be balanced against the considerable cost of excluding reliable information. *See Krull*, 480 U.S. at 347, 107 S.Ct. at 1166 ("[T]he Court has examined whether the rule's deterrent effect will be achieved, and has weighed the likelihood of such deterrence against the costs of withholding reliable information from the truth-seeking process."); *see also United States v. Payner*, 447 U.S. 727, 734, 100 S.Ct. 2439, 2445, 65 L.Ed.2d 468 (1980) ("[U]nbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury.").

*Calandra*, which dealt with a grand jury witness who had refused to answer questions based on illegally seized evidence, provides some guidance on the proper analysis of exclusion under the Fourth Amendment. *See, e.g.,* Dripps at 908–09 (discussing *Calandra* and the cost-benefit approach to exclusion). In *Calandra*, the district and appellate courts both refused to compel the defendant to answer questions he had been asked. Both courts found support in the exclusionary rule case law. *See In re Calandra*, 332 F.Supp. 737 (N.D.Ohio 1971), *aff'd*, 465 F.2d 1218 (6th Cir.1972), *rev'd*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561.

The Supreme Court reversed, Justice Powell writing that "the application of the [exclusionary] rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *Calandra*, 414 U.S. at 348, 94 S.Ct. at 620. Employing a balancing test, the Court held that the "speculative" deterrent effects of exclusion did not justify "substantially impeding the role of the grand jury." *Id.* at 351–52, 94 S.Ct. at 622. It is from within this framework of cost-benefit analysis that we approach whether to prohibit sentencing judges from considering evidence seized in violation of a defendant's Fourth Amendment rights.

■ Physical evidence seized in violation of the Fourth Amendment—unlike an involuntary confession taken in violation of the Fifth Amendment—is inherently reliable. *See United States v. Schipani*, 315 F.Supp. 253, 257–58 (E.D.N.Y.), *aff'd*, 435 F.2d 26, *cert. denied*, 401 U.S. 983, 91 S.Ct. 1198, 28 L.Ed.2d 334. As a result, balancing requires that we invoke the exclusionary rule only where our doing so will provide the systemic remedy of substantial deterrence.

The defendants and *amici* argue that allowing sentencing judges to consider illegally seized evidence will give police an incentive to violate the Fourth Amendment. They posit that police and prosecutors with enough lawfully obtained evidence for a conviction of a relatively minor offense that has a broad sentencing range could guarantee a heavier sentence by seizing other evidence illegally and introducing it at sentencing. They argue that as a result nothing will deter police from making illegal searches, especially in those situa-

tions where a conviction of a greater crime would lead to a similar sentence.

Defendants and *amici* do not explain why this supposed incentive to violate the Fourth Amendment will prove incrementally stronger than the rewards that already exist. Illegally seized evidence long has played a role in our legal system, and many of its uses might motivate a police officer to violate the Fourth Amendment. *See INS v. Lopez–Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) (exclusionary rule does not apply in a civil deportation proceeding); *United States v. Havens*, 446 U.S. 620, 627–28, 100 S.Ct. 1912, 1916–17, 64 L.Ed.2d 559 (1980) (illegally obtained evidence may be used for impeachment in a criminal case); *United States v. Janis*, 428 U.S. 433, 454, 96 S.Ct. 3021, 3032, 49 L.Ed.2d 1046 (1976) (exclusionary rule does not apply to federal civil proceedings); *Calandra*, 414 U.S. at 349–52, 94 S.Ct. at 620–21 (allowing introduction of illegally obtained evidence before the grand jury). The Supreme Court has held that these uses for illegally seized evidence do not diminish deterrence sufficiently to justify the exclusion of probative evidence. We see no reason why this additional use of illegally seized evidence justifies different treatment.

The argument also has been put before us that requiring the consideration of previously suppressed evidence at sentencing is the last step in wholly gutting the exclusionary rule, the other steps having been taken by the Supreme Court in its more recent Fourth Amendment opinions. We do not agree that this case "is the straw that breaks the camel's back" where Fourth Amendment concerns are at stake.

Great rewards still exist for following accepted police procedures. Here, for example, the government could have brought a more concrete case, supported by *all* the evidence, had the officers searched apartment 3k pursuant to a search warrant. Instead, suppression of the evidence found in apartment 3k forced the government to drop the firearms count of its indictment and the additional sentence that it could have carried. Having had the firearms charge would have allowed the prosecution to have made a strong case based on concrete evidence; instead, it had to proceed on the more circumstantial conspiracy case.

## 2. *Information Available at Sentencing*

Whether to consider illegally seized evidence at sentencing requires us also to consider the latitude given to judges to consider other evidence at sentencing. United States courts historically have permitted "a sentencing judge [to] exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed." *Williams v. New York*, 337 U.S. 241, 246, 69 S.Ct. 1079, 1082, 93 L.Ed. 1337 (1949). Because "[a] sentence reflects a prediction of future events based largely upon the defendant's past," *Schipani*, 315 F.Supp. at 255, a judge's inquiry traditionally has been "largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972).

The Sentencing Reform Act of 1984, Pub.L. No. 98–473, 98 Stat. 1987, codified the traditional purposes of sentencing, both recognizing the importance of imposing individual sentences, *see* 18 U.S.C. § 3553(a)(1)—(2), and displaying a desire to allow a broad inquiry into relevant information concerning a defendant. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); Guidelines § 6A1.3(a) ("In resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility."). Moreover, the Supreme Court recently has evinced a continued desire to provide courts with as much information as possible at sentencing. *See Payne v. Tennessee*, —— U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (capital sentencing juries may take into account evidence of the

murder victim's character and the impact of the crime on the victim's family).

■ The tradition of providing complete information at sentencing blossomed in a judicial system that granted a district judge enormous flexibility in assessing a suitable penalty. Obviously, such flexibility has been limited by the Guidelines. District judges do retain some limited discretion in imposing sentences, however, and only a showing of significant countervailing values—which has not been made in this case—would convince us to limit the information that district judges may or should consider in calculating Guidelines sentences.

### 3. *Mandatory or Discretionary*

We must determine whether consideration of illegally seized evidence is mandatory, discretionary or prohibited. Obviously, we reject the latter. Instead of compelling the consideration of all evidence at sentencing, we could leave the decision to the judgment of the district courts. The argument supporting this position asserts that district judges would gain greater discretion if we were to allow them to disregard illegally seized evidence. By not considering suppressed items, a judge could impose a more lenient sentence.

We have given this argument serious consideration and, while we do not disagree with its underlying premise, we conclude that it represents a fundamental misunderstanding of our task. The Guidelines evince a clear desire for uniformity, and *ad hoc* determinations would create disparities in sentences in the absence of differences in conduct. To allow judges to decide whether to consider illegally seized evidence at sentencing without factoring in the Fourth Amendment—by excluding evidence only where a systemic remedy of substantial deterrence will ensue—would sidestep Congress and violate Separation of Powers principles. We will not overstep the proper bounds of our judicial role.

We conclude that the benefits of providing sentencing judges with reliable information about the defendant outweigh the likelihood that allowing consideration of il-

legally seized evidence will encourage unlawful police conduct. Absent a showing that officers obtained evidence expressly to enhance a sentence, a district judge may not refuse to consider relevant evidence at sentencing, even if that evidence has been seized in violation of the Fourth Amendment. Consistent with our holding are the recent decisions of the District of Columbia Circuit, the Eleventh Circuit and the Third Circuit holding that district judges normally should consider illegally seized evidence at sentencing. *See United States v. Lynch*, 934 F.2d 1226 (11th Cir.1991) (district judge should consider illegally seized evidence at sentencing), *cert. denied*, —— U.S. ——, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992); *United States v. McCrory*, 930 F.2d 63 (D.C.Cir.1991) (same), *cert. denied*, —— U.S. ——, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992); *United States v. Torres*, 926 F.2d 321 (3d Cir.1991) (same); *but see United States v. Jewel*, 947 F.2d 224, 238–40 (7th Cir.1991) (Easterbrook, *J.*, concurring). We believe that to avoid disparity in sentencing, which is one of the goals of the Guidelines, sentencing judges must consider relevant illegally seized evidence.

### a. *Application to Tejada and Cabrera*

■ Tejada argues that even if *Schipani* remains good law, Judge Walker acted mistakenly when he stated that he *had to* consider the gun at sentencing. The argument is premised on the assumption that Judge Walker ignored *Schipani*'s exception for cases where evidence was seized expressly for the improper purpose of influencing the sentencing judge. We disagree with the foundation of this argument. Although Judge Walker did state that "I must consider the gun under *Schipani*," we interpret his statement as evincing his compulsion to consider the evidence in light of the circumstances. The record makes clear that Judge Walker properly familiarized himself with *Schipani*.

Judge Martin, on the other hand, made it clear that he did not consider *Schipani* valid in light of the Guidelines. On remand, he should consider whether the NY-

DETF acted with the intent of enhancing sentencing rather than under the misinformed assumption that Cabrera had consented to the search. If the illegal search was not motivated by a desire to enhance sentencing, then Judge Martin must consider the gun at sentencing.

**B. The Government's Appeal—The Object of the Conspiracy**

■ The government also appeals from Judge Martin's determination that the actual narcotics delivered, rather than the amount that the conspirators agreed to deliver, determined Cabrera's base offense level. We agree with the government's position on this issue.

■ Conspiracy, as an inchoate crime, commences with the agreement. *See United States v. Labat*, 905 F.2d 18, 21 (2d Cir.1990) ("Since the essence of conspiracy is the agreement and not the commission of the substantive offense that is its objective, the offense of conspiracy may be established even if the collaborators do not reach their goal.") (citations omitted); *United States v. Rubin*, 844 F.2d 979, 983 (2d Cir.1988) ("The fundamental element of a conspiracy is unlawful agreement.") (citations omitted). Because the agreement defines the conspiracy, the parties' failure to complete the transaction does not shrink the conspiracy's scope.

Guidelines § 2D1.4 reflects this jurisprudential focus, displaying a clear resolve to punish the agreement:

> Base Offense Level: If a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed.

Guidelines § 2D1.4(a). Application Note 1 to § 2D1.4 further explains that "[i]f the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount." Addressing this same issue, the Ninth Circuit, holding that the negotiated amount defined the scope of a conspiracy, stressed that

"[t]he fact that a little less is distributed does not affect the computation." *United States v. Alvarez–Cardenas*, 902 F.2d 734, 736 (9th Cir.1990); *see also United States v. Perez*, 871 F.2d 45, 48 (6th Cir.) ("Under the sentencing guidelines, the amount of the drug being negotiated, even in an uncompleted distribution, shall be used to calculate the total amount in order to determine the base level."), *cert. denied*, 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989). Similarly, in applying § 2D1.4 in *United States v. Adames*, 901 F.2d 11 (2d Cir.1990), we held that in a drug transaction the offense level of a defendant attempting to purchase narcotics is properly calculated according to the amount negotiated, not the lesser amount actually delivered.

We are not unmindful that the Guidelines create an exception for cases where the district court finds that the defendant did not intend or was not reasonably capable of supplying the agreed upon amount and was only "puffing." *See* Guidelines § 2D1.4, Application Note 1; *United States v. Vazzano*, 906 F.2d 879, 884 (2d Cir.1990). This case did not involve puffing, however. Cabrera agreed to deliver two kilograms of cocaine and came close to doing so.

**C. Tejada's Objections**

Tejada raises two additional issues on appeal. He argues that the evidence of his guilt was insufficient as a matter of law and that Judge Walker erred in permitting rebuttal evidence that exceeded the scope of direct examination. We reject both of these arguments as unpersuasive.

**1. *Sufficiency of Evidence***

■ 21 U.S.C. § 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the conspiracy." 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(B) prohibit possession with the intent to distribute cocaine. In two counts, the government charged that Teja-

da violated these sections, basing the latter count on an aiding and abetting theory. After a five day trial, a jury found Tejada guilty on both counts. On appeal, Tejada argues that the evidence before the jury was insufficient as a matter of law to support a conviction and that it established no more than his "mere presence." We disagree.

A defendant challenging the sufficiency of the evidence underlying his conviction bears a heavy burden. *United States v. Rivalta*, 892 F.2d 223, 227 (2d Cir.1989). "[A] conviction must be upheld if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Roldan–Zapata*, 916 F.2d 795, 802 (2d Cir.1990) (citations omitted), *cert. denied,* —— U.S. ——, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991). A jury may base its verdict on inferences from circumstantial evidence. *See United States v. Mariani*, 725 F.2d 862, 865–66 (2d Cir.1984). Moreover, in reviewing a challenge to the sufficiency of evidence, "we must credit every inference that could have been drawn in the government's favor." *Labat*, 905 F.2d at 22 (citations omitted).

■ As to Count One, the conspiracy charge, "once a conspiracy is shown, only slight evidence is needed to link another defendant with it." *United States v. Vanwort*, 887 F.2d 375, 386 (2d Cir.1989) (citations omitted), *cert. denied,* 495 U.S. 906, 110 S.Ct. 1927, 109 L.Ed.2d 290 (1990). The evidence need not prove that a defendant knew all of the other co-conspirators or all of the details of the conspiracy. *See Blumenthal v. United States*, 332 U.S. 539, 556–57, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947); *Labat*, 905 F.2d at 21 (citing *Blumenthal*).

■ To convict a defendant as an aider and abettor, the government need show only "'that [a defendant] in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wish[ed] to bring about, that he [sought] by his action to make it succeed.'" *United States v. Perry*, 643 F.2d 38, 46 (2d Cir.)

(citation omitted), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981). We properly may uphold a conviction even if a defendant did not participate "'in every phase of the criminal venture,'" *United States v. Ciambrone*, 787 F.2d 799, 809 (2d Cir.) (citations omitted), *cert. denied,* 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986), or have a "stake in the outcome of the illegal venture." *United States v. Tyler*, 758 F.2d 66, 70 (2d Cir.1985).

Tejada does not contest that the evidence in this case established a conspiracy. He only contends that the evidence was insufficient to link him to it. He asserts that he was merely present at the scene of the crime and that no evidence connected the cocaine to apartment 3k. He argues further that the evidence linking him to apartment 3k did not provide a sufficient nexus to connect him to the conspiracy. Because these arguments are not supported by the evidence, we uphold the convictions on both the conspiracy and the aiding and abetting counts.

Contrary to Tejada's assertions, this is not a "mere presence" case. Evidence clearly existed to support the jury's finding that Tejada was a knowing participant in the conspiracy and that he aided and abetted Cabrera's possession of the cocaine. After Detective Monge told Cabrera that he would be dissatisfied by anything less than a full two kilograms, Cabrera made a phone call and then suggested that he and Detective Monge go to 196th Street and Jerome Avenue. Cabrera told Detective Monge that they might find Mancebo there and that the cocaine was kept nearby. On arrival at that address, Cabrera immediately walked over to and spoke with Tejada, who was accompanied by Pumerol. After speaking to Tejada, Cabrera returned directly to Detective Monge with a report that Mancebo was in the area and that they now had the complete second kilogram of cocaine.

Cabrera then retrieved the cocaine from somewhere in 2800 Jerome Avenue and walked directly to Tejada and Pumerol, who were looking up and down the block. A brief conversation took place. The three

men, Cabrera, Tejada and Pumerol, then approached Detective Monge's vehicle. Pumerol stood behind the vehicle and continued to survey the area. Cabrera entered the vehicle, and Tejada spoke to him in Spanish through the passenger door, saying—according to Detective Monge—"Don't do the deal here. Take him around the corner."

Tejada argues that none of these facts suffices to connect him with the crimes for which he was charged. He argues that because the agents did not overhear the conversations between Cabrera, Tejada and Pumerol, their contents are unknown. He also argues that "[w]ithout evidence of the precise words allegedly spoken by Tejada, the jury simply had no basis on which to interpret their meaning." We reject both of these arguments.

Immediately after speaking to Tejada, Cabrera had the information that the second kilogram of cocaine was ready. We believe that a reasonable jury could have inferred from this fact that Tejada had supplied this news to Cabrera. Moreover, we do not agree that a jury must be told the actual words spoken by a defendant to interpret what he said. Here Detective Monge, a native Spanish-speaker, testified in English as to the meaning of a Spanish sentence. This information clearly was probative, and a reasonable jury could have inferred from it that Tejada, as a member of the conspiracy, had steered a drug deal into a more private area in order to avoid detection.

Tejada also argues that his relationship to apartment 3k did not connect him to the conspiracy. We disagree. After speaking to Tejada and then telling Detective Monge that "he was going to go up to the apartment and bring down the kilos," Cabrera entered into 2800 Jerome Avenue only to emerge a few moments later with the box that contained the cocaine. When arrested, Cabrera was carrying the keys to apartment 3k.

At the time of his arrest, Tejada carried a money order and a receipt for rent (although in another's name) for apartment 3k. He also was carrying a receipt from a sporting goods store listing apartment 3k as his address. We reject the notion that a reasonable jury could not have found from these facts that the conspirators used apartment 3k to store the cocaine delivered to Detective Monge and that Tejada had significant ties to the apartment and dealings that took place in it. We conclude, therefore, that a reasonable jury could have inferred both that Cabrera went to apartment 3k to obtain the second kilogram of cocaine and that Tejada was an active member of the conspiracy.

### 2. *Rebuttal Testimony*

▮▮▮▮▮ Tejada also contends that we should grant him a new trial because the district court allowed rebuttal evidence that exceeded the scope of direct examination. The function of rebuttal evidence is to explain or rebut evidence offered by an opponent. *See United States v. Neary,* 733 F.2d 210, 220 (2d Cir.1984). A district court has wide discretion in determining whether to permit evidence on rebuttal. *United States v. Nussen,* 531 F.2d 15, 20 (2d Cir.), *cert. denied,* 429 U.S. 839, 97 S.Ct. 112, 50 L.Ed.2d 107 (1976). Here, we conclude that the district court acted within its discretion in admitting the government's rebuttal evidence.

At trial, Diane Daiute, a private investigator hired by Tejada, testified that Detective O'Flaherty could not have seen the entrance to 2800 Jerome Avenue from his surveillance point on the date of arrest. Judge Walker allowed the government to present a witness, Agent Dongelli, to testify in the government's rebuttal case that from his surveillance position he had seen Cabrera enter 2800 Jerome Avenue empty-handed and return carrying a box.

Tejada argues that Judge Walker erred by allowing this testimony. Essentially, he contends that this rebuttal testimony exceeded the scope of the direct examination and should have been brought as part of the government's case-in-chief. Tejada offers no cases to support this position, however, and both of his arguments are without merit.

In *United States v. Casamento*, 887 F.2d 1141, 1171–72 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990), the defendants also argued that the government's rebuttal evidence was not within the permissible scope of direct. In that case, one of the defendants, Mazzurco, had testified in his own defense. On cross-examination, he had stated that he had worked as a broker and importer of precious gems, impliedly denying that he had any connection to narcotics trafficking. Responding to this testimony, the government presented rebuttal evidence that two police officers previously had seized six kilograms of cocaine and a piece of paper with Mazzurco's telephone number on it from one Guido Cocilovo. The government also presented a customs document, seized from Mazzurco's home, which linked the two men. By connecting Mazzurco to Cocilovo, who was both an importer and a drug trafficker, the government had sought to rebut the defendant's claim of innocence.

The defendants argued on appeal that "the evidence did not rebut any of the evidence presented by the defense, but merely bolstered the government's case." *Id.* We rejected this contention, holding that "[a] district court has wide discretion over what evidence may be presented on rebuttal." *Id.* (citations omitted).

As in *Casamento*, we are disinclined to overturn a district judge, who has determined—after watching a case unfold—that testimony properly rebuts an inference that a party's adversary has sought to make. Judge Walker properly concluded that Agent Dongilli's testimony was relevant and that it rebutted Ms. Daiute's testimony. In doing so Judge Walker did not abuse his discretion.

■ Tejada's argument that Judge Walker erred by allowing rebuttal testimony on matters that could have been introduced in the government's case-in-chief also fails. Trial judges have " 'wide discretion in permitting the introduction of evidence in rebuttal which might well have been brought out in the Government's case in chief.' " *United States v. Trapnell*, 495 F.2d 22, 25 (2d Cir.) (citation omitted), *cert.*

*denied*, 419 U.S. 851, 95 S.Ct. 93, 42 L.Ed.2d 82 (1974).

In *Weiss v. Chrysler Motors Corp.*, 515 F.2d 449, 457–59 (2d Cir.1975), a civil case, we considered an analogous issue. *Weiss* involved an automobile accident allegedly caused by a defective steering mechanism. At trial, the district judge had refused to allow the plaintiff to offer on rebuttal expert testimony that refuted the defendant's explanation of the accident. The district judge's rationale had been that the evidence should have been included in the plaintiff's case-in-chief.

We disagreed, holding that the exclusion of crucial evidence constituted an abuse of discretion. As we emphasized, " '[t]he plaintiff was not required to offer evidence which positively excluded every other possible cause of the accident.' " *Id.* at 459 (citation omitted). Any other rule would require attorneys to present evidence in advance to rebut every possible scenario that defendants might paint. This not only would be inefficient but would obfuscate the issues presented to the jury. Because the evidence here served to discredit the inference Tejada sought to create on direct examination, we hold that the district court did not abuse its discretion in admitting this evidence as part of the government's rebuttal case.

## CONCLUSION

We affirm defendant Tejada's sentence and judgment of conviction.

We reverse the ruling in *Cabrera* that the amount of drugs actually delivered defines the scope of a conspiracy. We vacate Cabrera's judgment of conviction as to the sentence only and remand to the district court for resentencing.