979 F.2d 849
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Dennis Macklin CHEATHAM, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
James Willard RICHARDSON, a/k/a Jimmy, Defendant-Appellant.
 Nos. 91-5195, 91-5199.
 United States Court of Appeals,
Fourth Circuit.
 Argued: July 10, 1992
Decided: November 23, 1992
 
 Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Fox, Chief District Judge.
 Argued: Douglas P. Connor, Mt. Olive, North Carolina, for Appellant Cheatham; George Bullock Currin, Cheshire, Parker, Hughes & Manning, Raleigh, North Carolina, for Appellant Richardson.
 Christine Witcover Dean, Assistant United States Attorney, Raleigh, North Carolina, for Appellee.
 On Brief: Margaret Person Currin, United States Attorney, Raleigh, North Carolina, for Appellee.
 Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and BUTZNER, Senior Circuit Judge.
 BUTZNER, Senior Circuit Judge:
 
 
 1
 A jury convicted Macklin Dennis Cheatham (Dennis) and James Willard Richardson of conspiracy to distribute and conspiracy to possess with the intent to distribute cocaine and marijuana. Dennis appeals his conviction and sentence; Richardson appeals his sentence. Finding no error, we affirm.
 
 
 2
 * The North Carolina State Bureau of Investigation and the Raleigh Police Department conducted an undercover operation aimed at Dennis's father, Owen Cheatham (Owen). A separate investigation targeted Howard Cowan. These two investigations merged, resulting in a six-count indictment against Owen, Dennis, Richardson, Keith Wade, Roger Sherron, and William Thomas, Jr. Count one of the indictment charged all the defendants with conspiracy to possess with intent to distribute and conspiracy to distribute cocaine and marijuana. Count three charged Dennis with aiding and abetting Owen in distributing approximately 197 grams of cocaine. Count six charged Richardson with distributing cocaine and aiding, abetting, and procuring another to distribute cocaine.
 
 
 3
 The jury convicted Dennis on the conspiracy count but acquitted him on the substantive count of aiding and abetting his father in distributing cocaine. The jury convicted Richardson on the conspiracy count but not on the count charging him with distributing and aiding, abetting, and procuring another to distribute cocaine.
 
 II
 
 4
 Dennis assigns error to the district court's refusal to grant his motions for a judgment of acquittal. He contends that the evidence was insufficient to submit the case to a jury.
 
 
 5
 The standard of review of this issue is set forth in Glasser v. United States, 315 U.S. 60, 80 (1942):
 
 
 6
 The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it. Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a "development and a collocation of circumstances."
 
 
 7
 (citations omitted). "Once it has been shown that a conspiracy exists, the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." United States v. Brooks, 957 F.2d 1138, 1147 (4th Cir. 1992).
 
 
 8
 Testimony disclosed that Dennis was present at drug transactions his father conducted with a confidential informant, Cowan, and Kenneth A. Mathis, who was a detective with the Raleigh police department. Cowan testified that in one deal Dennis tested the drugs by tasting them. Dennis helped count money that his father received from the sale of a kilogram of cocaine. Dennis also drove his father to the sites of drug transactions. When he was arrested, he had some of the money paid to his father for the sale of cocaine a few days before his arrest. The officers found the scales used in the January 4 transaction in Dennis's house. Transactions in which Dennis was involved also involved other members of the conspiracy. Viewing this evidence in the light most favorable to the government, we conclude that the evidence was sufficient to convict Dennis of conspiracy.
 
 III
 
 9
 Dennis objects to the court's calculation of his base offense level, arguing that it should not have included approximately 197 grams of cocaine that his father sold to detective Mathias.
 
 
 10
 On January 4, 1991, Mathias purchased approximately 197 grams of cocaine from Owen at the Cheatham farm. Mathias testified that when he arrived at the farm both Owen and Dennis were standing in the driveway. Owen instructed Mathias to park by a building known as the hunter's lodge, and told him he would meet him there. Owen met Mathias by the lodge and the two men went to what Owen called the Mexican house, behind the hunter's lodge area. Mathias weighed and tested the cocaine in the Mexican house and paid Owen in the lodge. Dennis was not present during any part of the transaction. Mathias noted, however, that Dennis and Owen met at the driveway as he was leaving.
 
 
 11
 A special agent with the Treasury Department, Bureau of Alcohol, Tobacco, and Firearms testified that while Mathias was at the Cheatham farm, he and a detective conducted surveillance near the farm. According to the agent, Dennis Cheatham drove by them slowly in a van. The government argued at the trial that Dennis was aiding and abetting Owen's sale of 197 grams of cocaine to Mathias by conducting countersurveillance in order to ensure the secrecy of the transaction.
 
 
 12
 The jury acquitted Dennis on the aiding and abetting count. Notwithstanding this acquittal, the district court at sentencing found that Dennis was acting as a lookout during Owen's sale of the drugs to Mathias. Accordingly, the district court held Dennis accountable with respect to his conspiracy conviction and included the 197 grams of cocaine in determining his base offense level.
 
 
 13
 Since Dennis and Owen were conspirators, Dennis is accountable for Owen's conduct in the furtherance of the conspiracy that was reasonably foreseeable. U.S.S.G. § 1B1.3 comment. (n.1) (1991). To be held accountable, Dennis need not have been aware of the precise amount of cocaine Owen sold. United States v. Scroggins, 939 F.2d 416, 423 (7th Cir. 1991). We review the district court's findings on this issue by the clearly erroneous standard. United States v. Vinson, 886 F.2d 740, 742 (4th Cir. 1989).
 
 
 14
 In view of Dennis's extensive involvement in Owen's drug transactions and in view of the testimony of the agents who observed Dennis's conduct during the sale to Mathias, we conclude that the district court's finding that Dennis was a lookout was not clearly erroneous. It was therefore proper to hold him accountable at sentencing for the 197 grams that Owen sold. U.S.S.G. § 1B1.3 comment. (n.1) (1991).
 
 
 15
 Dennis's acquittal of aiding and abetting Owen did not preclude the district court from attributing the 197 grams that Owen sold. In contrast to the government's burden of proof beyond a reasonable doubt on the issue of guilt, facts may be established by a preponderance of the evidence during sentencing. United States v. Vinson, 886 F.2d 740, 741-42 (4th Cir. 1989); see also United States v. Urrego-Linares, 879 F.2d 1234, 1237-39 (4th Cir. 1989). Because the standard of proof is lower than that needed for conviction, a sentencing court may find that a defendant committed an act for sentencing purposes even though the jury has acquitted him or her of the act." It is well settled that acquitted conduct may properly be used to enhance a sentence once a requisite finding is made by the sentencing judge." United States v. Romulus, 949 F.2d 713, 717 (4th Cir. 1991).
 
 IV
 
 16
 Both Dennis and Richardson object to the court's inclusion of 100 pounds of marijuana in calculating their respective base offense levels.
 
 
 17
 Mathias testified that after the January 4 transaction he and Owen talked from time to time about making another deal. Mathias agreed to provide 100 pounds of marijuana and $10,000 in exchange for two kilograms of cocaine. Owen was not selling the cocaine, but rather was serving as a broker between Mathias and one or two other individuals. This transaction was to take place on January 10, 1991.
 
 
 18
 In a recorded telephone conversation Owen indicated that he would not be able to work out the trade as originally planned. Rather, he had two buyers-one who wanted ten pounds of marijuana and one who wanted five pounds. Owen assured Mathias that he would still be able to sell him ten to twenty kilos of cocaine. Owen indicated that there was not going to be a swap of cocaine for marijuana, as the person selling the cocaine was not the person buying the marijuana.
 
 
 19
 Mathias left the marijuana at a motel rather than bringing it with him to the farm. He hoped to convince Owen to go to the motel to retrieve it, at which point officers at the motel would arrest him.
 
 
 20
 Mathias testified that a white van was leaving the farm as he was driving into it. Owen met Mathias beside the garage and told him that the cocaine had not arrived. Owen refused to go to the motel to retrieve the marijuana, saying he wanted to conduct the deal on the farm. Mathias testified that only one person was waiting in the barn area of the farm to buy the marijuana, but he did not know whether that person intended to make the 10 pound purchase, the 5 pound purchase, or both. Mathias never saw the person who was supposed to be waiting.
 
 
 21
 Mathias testified that while he was in Owen's house Dennis entered, went outside with Owen to converse, and did not re-enter the house. Fearing for his safety, Mathias hurriedly left the farm when Owen received a phone call from Wade warning him that the police were on his farm and that he was being busted. The police arrested the Cheathams after Mathias left.
 
 
 22
 Cowan, Wade, and Sherron all gave testimony linking Richardson to the transaction. According to Cowan, Richardson had told him that he wanted to buy 100 pounds of marijuana that Owen was selling. Richardson and Wade were to go to the Cheatham farm to examine and buy the marijuana. Richardson told Cowan that he drove a van to the Cheatham farm, but after he saw some strange-looking cars on the back roads and noticed deer fleeing from the woods, he decided to leave. The van Richardson drove matches the description of the van Mathias saw leaving the farm. Wade testified that he saw the police officers when he was riding to the Cheatham farm to test the marijuana for Richardson, and that he subsequently called Owen to warn him. Roger Sherron testified that on January 10 he was at Wade's mobile home and saw Richardson's van pull into Wade's yard. Wade later told Sherron that he was involved in a drug deal with Richardson in which they were supposed to trade cocaine for marijuana, with Wade testing the quality of the marijuana.
 
 
 23
 The court considered the transaction when calculating Richardson's base offense level because the government proved by a preponderance of the evidence that Richardson was involved. Vinson, 886 F.2d at 741-42.
 
 
 24
 Although Dennis's participation in the transaction scheduled for January 10 appears to be minimal, the court properly considered the 100 pounds of marijuana when determining Dennis's base offense level. Dennis saw Mathias in Owen's home on January 10 shortly before Wade warned Owen of the police. Dennis knew that Mathias and Owen dealt in drugs because he was present when Owen sold Mathias cocaine that Dennis had buried behind an informant's store. Also, when Dennis was arrested, he had some of the money that Mathias previously had paid Owen.
 
 
 25
 Since Dennis was a member of the drug conspiracy, the court could include as relevant conduct those transactions which he could have reasonably foreseen or of which he was reasonably aware. U.S.S.G. § 1B1.3 comment. (n.1) (1991); Vinson, 886 F.2d at 742. The transaction between Owen and Mathias would have been reasonably foreseeable and in furtherance of the conspiracy.
 
 
 26
 Dennis and Richardson both argue that, even if the sentencing court did not err in considering this transaction when calculating the base offense level, it should not have included the entire 100 pounds. They contend that Owen had neither the means nor the ability to conduct such a large drug transaction.
 
 
 27
 United States Sentencing Guideline § 2D1.4 comment. (n.1) (1991) provides:
 
 
 28
 If the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, when the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.
 
 
 29
 This guideline forbids the court from including the entire 100 pounds only if Owen lacked "both the intent and the ability to complete the drug transaction." Brooks, 957 F.2d at 1151 (emphasis in original). The amount negotiated is used when determining the base offense level even when a deal is consummated with a lesser amount. See United States v. Tejada, 956 F.2d 1256, 1264 (2nd Cir. 1992); United States v. Rottolo, 950 F.2d 70, 72 (1st Cir. 1991). The rationale behind this guideline is that the agreement, and not the actual amount of drugs involved in the transaction, defines the conspiracy. Tejada, 956 F.2d at 1264. Courts should be aware, however, that "an offhand statement referring to larger quantities of narcotics that amounts to no more than braggadocio is insufficient to establish that those quantities were 'under negotiation' as envisioned in Guidelines § 2D1.4(a)." United States v. Ruiz, 932 F.2d 1174, 1184 (7th Cir. 1991).
 
 
 30
 The district court's finding that the negotiated amount of marijuana was 100 pounds is not clearly erroneous. Far from merely bragging, Owen conducted serious negotiations about the price and the place of the 100 pound deal. Consequently, the district court did not err by attributing this amount to both Richardson and Dennis for the purpose of sentencing.
 
 V
 
 31
 Richardson also contests the court's two-level increase in his base offense level pursuant to U.S.S.G. § 3B1.1 for being a supervisor.
 
 
 32
 The testimony adduced at trial discloses that in December of 1988 Richardson twice helped Wade obtain cocaine. Wade testified that Richardson told him where to get the cocaine. Wade then sold the cocaine and gave the money to Richardson. When someone stole Wade's cocaine and he did not have the money to pay the source, Richardson paid for him. Richardson then agreed, at Wade's suggestion, to give Wade money that he could use to purchase marijuana. Wade would then repay Richardson with the profits of the subsequent marijuana sales.
 
 
 33
 In the summer of 1989 Richardson introduced Wade to Cowan. Richardson and Cowan bought marijuana from Wade and split the profits. In the fall of 1989 Wade and Cowan began making trips to Texas to purchase marijuana. Richardson did not invest in these ventures. In December of 1989 someone "ripped off" Cowan. When Wade would not lend Cowan money to get back into the business, Cowan sought it from Richardson. Richardson loaned Cowan $8,000 with the condition that Cowan pay him $10,000 in two weeks. Cowan did so with the profits from the marijuana sales. In the ensuing five months Cowan made monthly trips to Texas to purchase marijuana from sources unknown to Richardson. Richardson contributed money, and he and Cowan split the profits. Because the relationship between Wade and Cowan crumbled after Wade refused to loan Cowan money, Cowan and Wade stopped working with each other directly. Cowan delivered Richardson's share of marijuana to Richardson's cabin, where Wade would pick it up to sell. Wade testified that Richardson "sent" him to Texas "a whole lot." Richardson also recruited his girlfriend to carry money for drug buys.
 
 
 34
 The marijuana supply had dried up by July, 1990. At that time Richardson requested that Cowan deal with Wade. Cowan did not want to do so, but Richardson insisted. Cowan went to see Wade, who told him that someone in Dallas had a supply of marijuana that they could buy.
 
 
 35
 Wade was then arrested for attempting to purchase marijuana. Cowan testified that Richardson called him and told him they had to post bond for Wade. Cowan agreed to loan Richardson $5,000 for this purpose, but never had to pay because Wade posted his own bail.
 
 
 36
 The court increased Richardson's offense level by two levels, finding that Richardson was a supervisor under § 3B1.1(c). The court based its conclusion largely on Richardson's insistence that Cowan deal with Wade, although the men were not friendly.
 
 
 37
 We will reverse a sentencing court's adjustment based on the role of the defendant only if the court's determination is clearly erroneous. United States v. Sheffer, 896 F.2d 842, 846 (4th Cir. 1990). We have affirmed role adjustment increases for supervisors under U.S.S.G. § 3B1.1(c) in somewhat similar circumstances. See, e.g., United States v. Kincaid, 964 F.2d 325, 329 (4th Cir. 1992); United States v. Johnson, 943 F.2d 383, 387 (4th Cir. 1991). The record sustains the district court's finding that Richardson was a supervisor.
 
 VI
 
 38
 Richardson also claims that the court erred by including a 1979 conviction when calculating his criminal history category. Richardson had been convicted under a subsection of the reckless driving statute, since repealed, which stated:
 
 
 39
 Any person who operates a motor vehicle upon a highway or public vehicular area after consuming such quantity of intoxicating liquor as directly and visibly affects his operation of said vehicle shall be guilty of reckless driving and such offense shall be a lesser included offense of driving under the influence of intoxicating liquor as defined in G.S. 20-138 as amended.
 
 
 40
 N.C. Gen. Stat. § 20-140(c) (1978) (repealed 1983).
 
 
 41
 U.S.S.G. § 4A1.2(c) provides that sentences for certain misdemeanors and petty offenses are not counted unless"(A) the sentence was a term of probation of at least one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense." One of the misdemeanors in this category is careless or reckless driving. Application note 5 of the commentary to § 4A1.2 states: "Convictions for driving while intoxicated or under the influence (and similar offenses by whatever name they are known) are counted." Richardson argues that his prior offense was similar to careless or reckless driving and should not be counted since he did not receive either probation of more than a year or a jail term. The government argues that the prior offense was similar to driving under the influence and should be counted regardless of the penalty imposed.
 
 
 42
 A comparison of the relevant statutes supports the district court's determination that Richardson's prior conviction was similar to driving under the influence of intoxicating liquor. The elements of the offense more closely resemble those of driving under the influence than those of reckless driving. The reckless driving statute states that any person driving "carelessly and heedlessly in willful or wanton disregard of the rights or safety of others" or"without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property shall be guilty of reckless driving." N.C. Gen. Stat. § 20-140(a) & (b) (1978).
 
 
 43
 One may be guilty of driving under the influence of intoxicating liquor in violation of N.C. Gen. Stat. § 20-138 (1978) if one has taken enough drugs or consumed enough alcohol "to cause him to lose the normal control of his bodily or mental faculties, or both, to such an extent that there is an appreciable impairment of either or both of these faculties." State v. Harrington, 78 N.C. App. 39, 45, 336 S.Ed 852, 855 (1985) (quoting State v. Carroll, 226 N.C. 237, 241, 37 S.E.2d 688, 691 (1946)).
 
 
 44
 Under the provision of the statute that Richardson violated, one was guilty of reckless driving after consumption if he or she had consumed "such quantity of intoxicating liquor as directly and visibly affects his operation of said vehicle." N.C. Gen. Stat. § 20-140(c) (1978). The statute includes the element that the culprit consume enough alcohol to be visibly affected, as does the interpretation placed on the driving under the influence statute. The statute does not require willful or wanton disregard of the rights of others or conduct so as to endanger the lives of others, as does the reckless driving statute.
 
 
 45
 We conclude that the offense for which Richardson was convicted more closely resembles driving under the influence of intoxicating liquor rather than careless or reckless driving. We therefore affirm the court's finding with respect to Richardson's criminal history category.
 
 
 46
 No. 91-5195 (Dennis Cheatham) AFFIRMED No. 91-5199 (Richardson) AFFIRMED