# United States Court of Appeals
## For the First Circuit

No. 01-2224

UNITED STATES OF AMERICA,
Appellee,

v.

CESAR ACOSTA, a/k/a NELSON BARRERA,
a/k/a PEDRO LOZADA,
Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Lynch Circuit Judge,
Campbell and Bownes, Senior Circuit Judges.

Jonathan R. Saxe, Assistant Federal Public Defender, with whom Owen S. Walker, Federal Public Defender, was on brief for appellant.
Jean B. Weld, Assistant U.S. Attorney, with whom Thomas P. Colantuono, U.S. Attorney, was on brief for appellee.

August 30, 2002

**BOWNES, Senior Circuit Judge.** Defendant-appellant Cesar Acosta pled guilty to a one-count indictment charging him with use and attempted use of one or more unauthorized access devices in violation of 18 U.S.C. §§ 1029(a)(2) and (b)(1). In determining the offense level, the district court calculated total loss in excess of $20,000, sentencing Acosta to ten months imprisonment and three years of supervised release. In calculating restitution, the court considered suppressed evidence that it had excluded from the loss calculation. Acosta appeals both the loss amount, with its resulting offense level, and restitution award. We **AFFIRM.**

## I. BACKGROUND

### A. Facts

On October 2, 2000, Acosta used an American Express card in the name of Nelson Barrera to purchase three $250 gift cards from a J.C. Penney store in Nashua, New Hampshire. Store security officer Mark Kidd witnessed the purchase, followed Acosta into the parking lot, and observed him enter the Sears store. Acosta's purchase aroused Kidd's suspicions because the store had recently experienced losses arising from multiple gift card purchases through counterfeit credit cards. At the time he observed Acosta, Kidd was unaware that the defendant was using a fraudulent card. Sears security videotaped Acosta as his card

-2-

was denied when he attempted to purchase similar gift certificates. Kidd then observed Acosta enter a car, which, it developed, was registered to Acosta's girlfriend, Delva Castanos. Security Officer Kidd contacted American Express and learned that Nelson Barrera was not a valid American Express account holder.

On October 14, 2000, Acosta purchased two more $250 gift certificates from a Target store in Nashua, New Hampshire, using a MasterCard also in the name of Nelson Barrera. Eleven days later, investigators from the Nashua Police Department and Secret Service went to the apartment of Acosta's girlfriend Delva Castanos. Castanos identified the man in the Sears videotape as Acosta and consented to a search of her apartment and vehicle.

About the same time, Officer Karen Becotte of the Nashua Police Department stopped Acosta as he was driving Castanos's car in the parking garage of the building in which she had an apartment.[1] Acosta showed her a New Hampshire driver's license in the name of Pedro Lozada. Becotte falsely informed Acosta that his vehicle was suspected of involvement in a hit-and-run accident, and Acosta accompanied her to the police station in Castanos's car.

---

[1]The record suggests, but is not entirely clear, that Acosta was driving out of the garage.

-3-

In an interview at the police station, Acosta admitted to the use of a number of aliases and stolen credit cards. He said he had obtained the cards from an individual he knew as "Fat John." He also indicated that Castanos's apartment contained evidence including items purchased with these cards, receipts, and additional fraudulent credit cards. Acosta accompanied investigators to the apartment, showed them the evidence, and provided them with seventeen credit cards in several different names.

Prior to Acosta's interrogation, Officer Kidd also learned of fraudulent credit card charges at a J.C. Penney store in Concord, New Hampshire, on February 21 and 22, 2000. These charges, on a card issued to Rafael Vila, consisted of four $250 gift card purchases and a $124.98 merchandise purchase, totaling $1,124.98. The government linked Acosta to these transactions through his use of an American Express card to fraudulently purchase gift cards at a J.C. Penney in Salem, New Hampshire, on January 10, 2000. Later, an individual using the name Joseph Trimpin redeemed the J.C. Penney gift cards purchased by both

Vila and Acosta at a store in Miami, Florida.[2]  Through Trimpin's

actions, the government linked Acosta to the Vila transactions.

### B.  Procedural History

On November 9, 2000, Acosta was indicted on one count

of possession of, with intent to defraud, fifteen or more

counterfeit or unauthorized access devices (credit cards), in

violation of 18 U.S.C. § 1029(a)(3).  Acosta filed a motion to

suppress, arguing that he had been illegally arrested, questioned

absent Miranda warnings, and questioned after he had requested an

attorney.  The district court granted the motion, suppressing all

of Acosta's statements and all evidence derived therefrom,

including a number of credit cards and receipts found at

Castanos's apartment.  After this, the district court granted the

government's motion to dismiss the indictment.  On March 15,

2001, the government reindicted Acosta on one count of

fraudulently using and attempting to "use one or more

unauthorized access devices . . . including, but not limited to,

American Express Card # 371388014444020, to fraudulently obtain

property and other items of [sic] with an aggregate value of more

than one thousand dollars" between January 1, 2000 and

---

[2]Investigators also learned of various other unauthorized
MasterCard and American Express charges that Acosta does not
dispute on appeal.

October 25, 2000, in violation of 18 U.S.C. §§ 1029(a)(2) and (b)(1). Acosta filed another motion to suppress, which the district court dismissed as moot based on the government's representations that it would not rely on any evidence covered by the earlier suppression order to prove the charge in the second indictment. The district court also dismissed as moot Acosta's motion to dismiss or, in the alternative, for a bill of particulars because "the government has represented that the indictment's reference to 'other access devices' refers to those credit cards identified in its Objection to Defendant's Motion to Dismiss . . . and that its evidence will be limited to the access devices identified in the indictment and in its objection." The government represented in this motion that "[n]one of the information [in the second indictment] is subject to the suppression decision" and that it would not attempt to use the suppressed evidence without the court's permission.

Acosta pled guilty to this new indictment and signed a binding plea agreement stipulating that the amount of loss from his charged conduct did not exceed $40,000.

The government also filed a sentencing memorandum with attachments in support of its sentencing positions. This report incorporated the results of a Secret Service inquiry into the use of American Express card number 371388014444020, which found that

the card had been legitimately issued to Olgamarina De Tunez of Miami, Florida. The memo report contained a list of seventy-six fraudulent charges on this credit card. Three entries reflected the October 2 transactions that Officer Kidd had witnessed at the J.C. Penney store in Concord, New Hampshire. Other charges included transactions at Henri Bendel, a business in New York City, on September 7, 2000; K-Mart in North Miami, Florida, and Sam Goody in Salem, New Hampshire, all on September 14, 2000; Sears Roebuck in Manchester, New Hampshire, on September 15, 2000; Scoop East in New York City and Lenscrafters and Sears Roebuck in Nashua, New Hampshire, all on September 24, 2000; as well as myriad other transactions at New Hampshire and Massachusetts businesses. The fraudulent charges to this account, an account known to investigators prior to their obtaining the suppressed evidence on October 25, 2000, totaled $17,243.69.

At sentencing, the district court ruled that the suppressed evidence could not be used to calculate offense level because the police had acted "egregious[ly]" in obtaining it. The court attributed the purchases made by Vila to Acosta and included them to calculate total loss. The court included the $1,124.98 in purchases by Vila, $17,243.69 in American Express Card purchases, $1,498.99 from Acosta's fraudulent use of a

MasterCard, and $259.96 from Acosta's purchases at Sears to calculate total loss for Acosta's guideline range. The resulting total, $20,127.62, yielded a total offense level of ten with a guideline sentencing range (GSR) of six to twelve months. Applying a criminal history category of I, the court sentenced Acosta to ten months imprisonment and three years of supervised release. It also ordered restitution of $37,756.30, an amount that included the suppressed transactions. Without any defense objection as to accuracy, the court adopted this restitution figure from the government's August 23, 2001, letter to the Probation Office, which referred to affidavits of loss provided by the credit card companies.

## II.  DISCUSSION

Acosta appeals the district court's calculations of loss, along with its resulting offense level, and restitution. On loss, he contests both the $17,243.69 American Express figure, arguing it should be $750.00, and the $1,124.98 figure, claiming no part of it should be attributed to him. He contends that his sentence should be based on a loss figure of less than $5,000, resulting in an offense level of six, and a GSR of zero to six months. He also contests the restitution amount, arguing that the district court should not have considered the suppressed transactions. We reject both arguments.

## A. Loss Calculation

Acosta argues that the district court erred in calculating his offense level by including unsuppressed credit card charges that the government did not prove Acosta personally made. We review the district court's findings of fact for clear error. United States v. Brewster, 1 F.3d 51, 54 (1st Cir. 1993). This Court grants great deference to a district court's calculation of the amount of loss for sentencing purposes:

> Calculating the amount of loss for purposes of the sentencing guidelines is more an art than a science. . . . [A] party dissatisfied with the sentencing court's quantification of the amount of loss in a particular case must go a long way to demonstrate that the finding is clearly erroneous.

United States v. Rostoff, 53 F.3d 398, 407 (1st Cir. 1995) (citations omitted). The government must prove the amount of loss under U.S.S.G. § 2F1.1 by a preponderance of the evidence. United States v. Vaknin, 112 F.3d 579, 582-83 (1st Cir. 1997); United States v. Keifer, 198 F.3d 798, 800 (10th Cir. 1999). The sentencing must be based on information bearing "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a), p.s. (2001).

Acosta argues that the district court and government were merely speculating that he was the only person with access to the unauthorized American Express card number 371388014444020.

He points out that because the card was not a stolen card, but rather a card manufactured fraudulently using an illegally-obtained card number, the likelihood was very low that a person would go to the trouble of fraudulently obtaining a credit card number only to produce just one fake card and then take that card from Florida to New England to sell it. Further, Acosta points out that when faced with evidence that the same credit card number was used on the same day at a K-Mart in North Miami, Florida and at Sam Goody in Salem, New Hampshire, the government explained the potential problem by saying that the Miami use was erroneously classified as fraudulent and was in fact a legitimate transaction.[3] Acosta argues that it is possible that other uses were similarly classified as fraudulent by mistake.

Acosta also highlights the two instances where a fraudulent card was used in New York and New Hampshire on the same date to further suggest that another person was using the same account number, and points out that no evidence was offered to refute this possibility. While conceding that it was theoretically possible that the New York purchases were made by telephone or that he traveled to both states on the same day, Acosta argues that these scenarios are highly unlikely and the

_____

[3]The Miami charge was ultimately excluded from the loss calculation.

-10-

government's evidence linking him to these purchases is insufficient.

Accordingly, Acosta argues, he should be held responsible only for the three of the seventy-six uses of American Express Card number 371388014444020 that occurred on October 2, 2000, at J.C. Penney in Nashua, New Hampshire. In contrast, the government argued, and the court found, that all uses of this card, totaling $17,243.69, were attributable to Acosta.

At the sentencing hearing, the district court judge concluded that the government had met its burden under the preponderance of the evidence standard:

> I find that the government has established by a preponderance of the evidence that the $17,243.69 of attributable losses is correct. I'm satisfied that there's no evidence that there were multiple cards with the same number. There's certainly some questionable charges here, but there are myriad explanations as to how that could happen. . . . [C]ertainly it's not inconceivable at all, in fact it's very plausible, that the defendant could easily have made phone calls to these New York Stores and ordered whatever was ordered. You don't have to be personally there. It could be phone calls. It could be whatever. He had the card in his possession. He was in the area. There's no evidence that convinces me or satisfies me that there's a real plausibility of another duplicate card out there other than the original card, so I

-11-

think the government's met its burden of proof with respect to that number.

Excluding the suppressed evidence to calculate loss for sentencing purposes, the court eliminated $2,831.31 and adopted the $17,243.69 figure as charges to American Express card number 371388014444020. This excluded the Miami, Florida, charge.

Indeed, most of the charges attributed to Acosta occurred in a tight geographical area - New Hampshire and Massachusetts - and many were gift cards. The court concluded that the preponderance of the evidence demonstrated Acosta likely made the purchases. Further, of the seventy-six transactions charged to American Express card number 371388014444020, only three were made in New York, which is outside the tight geographical area. The district court concluded that Acosta could have made these charges himself, likely over the phone or in person.

Considering the argument that the purchases made on the card issued to Vila should not be attributed to Acosta, the district court recognized that the question was a "close" one but determined that the government had met its burden, establishing "by a preponderance of the evidence . . . that [the] charge made by Mr. Vila, independently [of the] suppressed evidence, was made

by Mr. Acosta."[4]  The district court included this amount in the calculation of loss.

Given the high level of deference we accord to a trial court's calculation of loss for sentencing purposes and the judge's reasoned explanations on both figures, we see no clear error in the district court's loss calculation.

**B.  Restitution**

Acosta argues that the district court erred in using the suppressed evidence to calculate restitution.  We review this claim of legal error de novo.  United States v. Collins, 209 F.3d 1, 2 (1st Cir. 1999); United States v. Neal, 36 F.3d 1190, 1199 (1st Cir. 1994); United States v. Savoie, 985 F.2d 612, 618 (1st Cir. 1993).

---

[4]The district court explained:

I think it would certainly be demonstrable that Mr. Kidd concluded, and certainly the Court would conclude, that once it's established that Barerra [sic] is Acosta and Barrera has purchased gift certificates with a fraudulent card, and the same modus operandi was used virtually contemporaneously and the gift certificates were sent for redemption to the same person at the same place in the same state, virtually contemporaneously, for cashing in, it's certainly reasonable to draw the inference then that the persons are the same people operating under different names; that is Mr. Acosta.

### 1. Use of Suppressed Evidence

This Circuit has yet to decide whether a court may use evidence suppressed under the Fourth Amendment in the context of Sentencing Guidelines proceedings. United States v. Raposa, 84 F.3d 502, 503 (1st Cir. 1996) (addressing but declining to decide the issue). We have noted, however, that all the courts that have addressed this issue have held that "there is no blanket prohibition on the consideration of illegally seized evidence for the purposes of making the findings required under the Guidelines."[5] Id. at 504. Indeed, ten other circuits have ruled that in most circumstances, the Fourth Amendment exclusionary rule does not bar the introduction of suppressed evidence during sentencing proceedings.[6] United States v. Ryan, 236 F.3d 1268, 1271-72 (10th Cir. 2001) (citing United States v. Brimah, 214

---

[5]Nevertheless, this rule has not been met with universal acclaim. Raposa, 84 F.3d at 505 (citing United States v. Jewel, 947 F.2d 224, 238-40 (7th Cir. 1991) (Easterbrook, J., concurring); United States v. McCrory, 930 F.2d 63, 70-72 (D.C. Cir. 1991); Wayne R. LaFave, 1 Search and Seizure § 1.6, at 40-41 (2d ed. Supp. 1995)).

[6]The only other circuit that has not yet addressed this issue after the passage of the Sentencing Guidelines reached the same conclusion as the other Circuits in a pre-Guideline case. United States v. Lee, 540 F.2d 1205, 1211 (4th Cir. 1976) (noting that deterrent effect of extending the exclusionary rule to sentencing "would be so minimal as to be insignificant").

F.3d 854, 857-59 & n.4 (7th Cir. 2000) (holding exclusionary rule at sentencing should not bar introduction of evidence seized in violation of Fourth Amendment, but leaving open question of whether the rule applies when police intentionally act illegally to enhance defendant's sentence); United States v. Tauil-Hernandez, 88 F.3d 576, 581 (8th Cir. 1996) (holding the exclusionary rule does not apply at sentencing); United States v. Kim, 25 F.3d 1426, 1435 & n.8 (9th Cir. 1994) (admitting evidence from illegal search and seizure at sentencing, but leaving open the question of whether the rule applies when police intentionally act illegally to enhance defendant's sentence or had an "undue incentive" to so act); United States v. Montoya-Ortiz, 7 F.3d 1171, 1181 & n.10 (5th Cir. 1993) (holding exclusionary rule is generally inapplicable to sentencing proceedings, but suggesting that illegally seized evidence could be excluded if it was seized for the sole purpose of enhancing defendant's sentence); United States v. Jenkins, 4 F.3d 1338, 1344-45 (6th Cir. 1993) (permitting the use of illegally seized evidence after finding no indication that evidence was obtained to enhance defendant's sentence); United States v. Tejada, 956 F.2d 1256, 1263 (2d Cir. 1992) ("Absent a showing that officers obtained evidence expressly to enhance a sentence, a district judge may not refuse to consider relevant evidence at sentencing,

-15-

even if that evidence has been seized in violation of the Fourth Amendment."); <u>United States</u> v. <u>Lynch</u>, 934 F.2d 1226, 1236-37 & n.15 (11th Cir. 1991) (admitting illegally obtained evidence and reserving question of whether suppression would be necessary if illegal search was done with purpose of increasing defendant's sentence); <u>McCrory</u>, 930 F.2d 63, 69 (D.C. Cir. 1991) (same); <u>United States</u> v. <u>Torres</u>, 926 F.2d 321, 325 (3d Cir. 1991) (same)). Nine of these circuits have added or left open the possibility that the exclusionary rule will still apply if there is an indication that the police violated the defendant's Fourth Amendment rights with the intent to secure an increased sentence. <u>Ryan</u>, 236 F.3d at 1272; <u>Brimah</u>, 214 F.3d at 858 n.4; <u>Kim</u>, 25 F.3d at 1435 n.9; <u>Montoya-Ortiz</u>, 7 F.3d at 1181 n.10; <u>Jenkins</u>, 4 F.3d at 1345; <u>Tejada</u>, 956 F.2d at 1263; <u>Torres</u>, 926 F.2d at 325; <u>Lynch</u>, 934 F.2d at 1237 n.15; <u>McCrory</u>, 930 F.2d at 69.

These other circuits have carefully reasoned that, inter alia, the deterrent effect of the exclusionary rule does not outweigh the detrimental effects of excluding reliable evidence on the court's ability to meet its goal of proper sentencing. <u>E.g.</u>, <u>Tejada</u>, 956 F.2d at 1262 (concluding that allowing illegally obtained evidence to be considered at sentencing would not provide greater incentives for police to violate the Fourth Amendment); <u>Lynch</u>, 934 F.2d at 1236-37. They

-16-

have also recognized that the sentencing court needs to have the fullest information available to fashion an appropriate remedy and that the Sentencing Guidelines allow the sentencing court to consider, without limitation, any information concerning the defendant's background, character, or conduct. E.g., McCrory, 930 F.2d at 68; 18 U.S.C. § 3661 (2000);[7] see also United States v. Robins, 978 F.2d 881, 891 (5th Cir. 1992) (noting that "[i]t is a fundamental principle of sentencing that a district court may conduct an inquiry broad in scope, largely unlimited either as to the kind of information it may consider, or the source from which such information may come" (citing United States v. Campbell, 684 F.2d 141, 152 (D.C. Cir. 1982)).

While never having spoken directly on this issue, the Supreme Court has recognized the exclusionary rule as

> a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved. Despite its broad deterrent

---

[7]18 U.S.C. § 3661 provides, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." The district court's discretion is not unlimited in scope, however. Brimah, 214 F.3d at 856 (citing U.S.S.G. §§ 5H1.1-1.6, 5H1.10, which list factors including, inter alia, age, education, and race, that are not relevant in sentencing determinations).

> purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons.

United States v. Calandra, 414 U.S. 338, 348 (1974) (weighing the deterrent effect of the exclusionary rule on police misconduct against the potential benefit of extending the rule to grand jury proceedings).

It is clear that in sentencing, consideration of evidence suppressed under the Fourth Amendment is "consistent with the caselaw on the exclusionary rule and follows the well-established practice of receiving evidence relevant to sentencing from a broad spectrum of sources." Torres, 926 F.2d at 325. Given the great weight of the precedent and following the unanimous, reasoned approach of our sister circuits, we hold that the exclusionary rule does not bar the use of evidence seized in violation of a defendant's Fourth Amendment rights in sentencing.[8] We leave open the question of whether the exclusionary rule would bar the use of evidence when police intentionally act in violation of the Fourth Amendment in order

_____

[8]We note that the evidence suppressed by the district court included both credit cards and receipts seized in violation of Acosta's Fourth Amendment rights and statements investigators obtained from Acosta in violation of his Fifth Amendment rights. The dispute before us for restitution purposes concerns only the suppressed credit card receipts.

to increase a defendant's sentence. Therefore, the district court was not required to exclude the suppressed evidence in the context of sentencing in this case, even though it chose to do so in calculating the loss. This is not a case where the officers acted with intent to enhance Acosta's sentence. The district court found no such intent and neither side disputes this conclusion. Determining that the district court could properly have considered the suppressed evidence in Acosta's sentencing proceedings, we next examine whether the restitution order was otherwise valid.

## 2. Legal Requirements of a Restitution Order

The Victim and Witness Protection Act (VWPA) authorizes a district court to order "in addition to or . . . in lieu of any other penalty authorized by law, that the defendant make restitution to any victim" of the offense. 18 U.S.C. § 3663(a). The purpose behind the statute is to "insure that the wrongdoer make good[], to the degree possible, the harm he has caused to the victim." Vaknin, 112 F.3d at 582 (citation and internal quotations omitted) (alteration in original). The Supreme Court has held that this statute limits restitution awards to "the loss caused by the specific conduct that is the basis of the offense of conviction." Hughey v. United States, 495 U.S. 411, 413 (1990). In addition, where the criminal conduct includes "an

-19-

offense that involves as an element a scheme, conspiracy, or pattern of criminal activity," a victim is defined as "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663(a)(2) (2000). In such cases, the district court may order restitution without regard to whether the conduct that harmed the victim was conduct underlying the offense of conviction. E.g., United States v. Hensley, 91 F.3d 274, 277 (1st Cir. 1996).

It is undisputed that restitution is part of a sentence. See, e.g., United States v. Wallen, 953 F.2d 3, 4 (1st Cir. 1991) (referring to restitution imposed by the court as "part of [the defendant's] sentence"); 18 U.S.C. § 3663(a)(1)(A) ("The court, when sentencing a defendant . . . may order . . . that the defendant make restitution" (emphasis added)). Thus, under the VWPA and Hughey, the suppressed evidence in this case may be included in the restitution award only if (1) the offense involved a scheme, conspiracy, or pattern of criminal activity; or (2) the evidence represents conduct that was the basis of the offense of conviction. We address each issue in turn.

### a. Scheme or Conspiracy

Under 18 U.S.C. § 3663(a)(2), any conduct that is in the course of the scheme, conspiracy, or pattern may be considered in calculating restitution. Thus, if this case

involved a scheme, conspiracy, or pattern of criminal activity, the district court could properly include the suppressed evidence in the restitution order regardless of whether it was conduct of conviction.

It is clear from the record that the offense with which Acosta was charged was not one involving a scheme, conspiracy, or pattern of criminal activity. Acosta pled guilty to "knowingly and with intent to defraud traffic[king] in or us[ing] one or more unauthorized access devises during any one-year period, and by such conduct obtain[ing] anything of value aggregating $1,000 or more during that period." 18 U.S.C. § 1029(a)(2). It is clear that this offense does not include as an element a scheme, conspiracy, or pattern of criminal activity. United States v. Blake, 81 F.3d 498, 506 (4th Cir. 1996) (stating that the offense of fraudulent use of unauthorized access devices in violation of 18 U.S.C. § 1029(a)(2) does not "include as an element a scheme, conspiracy, or pattern of criminal activity").

### b. Conduct of Conviction

We now turn to the question of whether the suppressed credit cards represented conduct that was the basis of the offense of conviction. Surprisingly, none of the proceedings below considered whether this evidence was conduct of conviction. Rather, this evidence was treated as "relevant conduct"

throughout.[9]    The distinction between relevant conduct and

conduct underlying the offense of conviction is an important one.

Unless the offense involves as an element a scheme, conspiracy,

or pattern of criminal activity, relevant conduct may not be

taken into account for calculation of restitution; only conduct

of conviction may be considered.  United States v. Benjamin, 30

F.3d 196, 198 & n.1 (1st Cir. 1994).    Nevertheless, the

responsibility to bring this issue to the court's attention

rested with the defendant.    Because Acosta failed to raise the

issue below, he has forfeited it; we therefore review the court's

use of the suppressed evidence in calculating restitution for

plain error only.  United States v. Olano, 507 U.S. 725, 731-32

(1993).   Establishing plain error requires a four-part showing:

"that there was error; that it was plain; that the error affected

the defendant's substantial rights; and that the error adversely

---

[9]In the Presentence Report (PSR), the suppressed transactions
are listed under the heading "Offense Conduct," along with a
notation that the evidence was suppressed.  The PSR refers to the
suppressed transactions as "relevant conduct to the offense of
conviction."   In the Addendum to the Presentence Report, the
Probation Office stated that the suppressed transactions were "part
of the same course of conduct to the offense of conviction."  The
government referred to the suppressed evidence seized from
Castanos's apartment as "relevant conduct" in both its sentencing
memorandum and its letter to the Probation Office listing the
restitution amounts requested.   The district court adopted this
letter as an exhibit and used the amounts in it to order
restitution.  The Presentence Report also referred to these items
as relevant conduct.

impacted the fairness, integrity, or public repute of judicial proceedings."  <u>United States</u> v. <u>Saxena</u>, 229 F.3d 1, 5 (1st Cir. 2000).  We see no plain error here.

Acosta argues that in light of the references to the suppressed transactions as relevant conduct below, and the fact that the government's proffer at the change of plea hearing included only the unsuppressed evidence, the evidence does not support the argument that the suppressed credit cards represented conduct of conviction.  He further contends that because the district court declined to use the suppressed evidence in calculating the offense level as a due process matter because the

violation of his rights was "egregious," it should likewise not have used the evidence to calculate restitution.[10]

The government counters that the district court could have found that the suppressed transactions were conduct underlying the offense to which Acosta pled guilty. The indictment to which Acosta pled guilty was very broad,[11] charging

_____

[10]In excluding the suppressed evidence from the loss calculation, the district court reasoned:

> I think I'm satisfied that, given the totality of the circumstances, the fact that the violation of the defendant's constitutional rights was egregious, that the suppressed evidence as a matter of due process should not be used to enhance his sentence under the applicable Sentencing Guidelines. I don't find that the police officers had an intent to enhance the sentence. . . . However, the violations are egregious, and I think the purposes underlying the exclusionary rule are well served . . . where we have egregious violations and where the evidence, having been suppressed in one case, is attempted to be used in a subsequent case to enhance the punishment.

[11]At least in the scheme context, other circuits have determined the full amount of restitution authorized by statute by "look[ing] to the scope of the indictment, which in turn defines the scope of the criminal scheme for restitution purposes." United States v. Ross, 279 F.3d 600, 609 (8th Cir. 2002) (internal citations and quotations omitted) (alteration in original); United States v. Ramirez, 196 F.3d 895, 900 (8th Cir. 1999) (noting that other circuits agree in the criminal scheme context, the indictment defines the scope of the scheme for restitution purposes (citing United States v. Henoud, 81 F.3d 484, 488 (4th Cir. 1996) and cases cited)); United States v. Jackson, 155 F.3d 942, 949-50 (8th Cir. 1998); United States v. Turino, 978 F.2d 315, 319 (7th Cir. 1992).

him with using and attempting to use "one or more unauthorized access devices" during a ten-month period and obtaining value of at least $1,000 from this conduct. It specifically noted that this conduct included, but was "not limited to," American Express card number 371388014444020. The government points out that charging the use of more than one credit card to obtain the statutory jurisdictional amount of $1,000 is common practice.

Further, the government argues, Acosta's reliance on Hughey, 495 U.S. 411 (1990), to contend that the loss associated with the suppressed evidence is not conduct of conviction, is misplaced. In Hughey, the defendant pled guilty to one count of a multi-count indictment for using stolen credit cards. Id. at 413. The Supreme Court reversed the district court's restitution order because it had included the use of other credit cards to which the defendant had not pled guilty. Id. at 422.[12] Here, in contrast, Acosta pled guilty to one charge of using one or more cards during a ten-month period. The government argues that this charge included all possible credit cards connected to him during this time frame. From discovery, Acosta was aware that the government would introduce proof of his other use of cards. The

_____

[12]Congress responded to Hughey by expanding the scope of the VWPA to include as victims those harmed by an offense that involves a scheme, conspiracy, or pattern of criminal activity as an element. 18 U.S.C. § 3663(a)(2).

-25-

government argues that although it agreed not to introduce the suppressed evidence, at sentencing, the district court could have considered that evidence conduct of conviction.

We reject Acosta's arguments and find no plain error in the district court's use of the suppressed evidence in the restitution calculation. We do not equate the district court's refusal to use the evidence in the loss calculation with a determination that the suppressed transactions were not part of the offense of conviction.

At the sentencing hearing, the district court expressed concern for Acosta's right to due process and excluded the illegally obtained evidence from its calculation. This, however, did not remove the evidence itself from the offense conduct actually charged in the indictment. A district court "need not make open-court findings on the statutory factors when issuing a restitution order so long as the record on appeal reveals that the judge made implicit findings or otherwise adequately evinced his considerations of those factors." Neal, 36 F.3d at 1200 (citing Savoie, 985 F.2d at 618). The district court adequately explained that the policies underlying its decision to apply the exclusionary rule in calculating offense level were different from the strong policy considerations underlying the victims' right to compensation:

> I'm not sure the police misconduct should inure to the detriment of a victim with respect to the restitution. That's a whole different pathway of legal social policy issues to be considered. It's one thing to say we're not going to use evidence obtained through police misconduct for the purpose of enhancing your incarcerative sentence. It's quite another thing to say to an innocent victim we're going to use police misconduct for the purposes of depriving you of your right to restitution. . . . I think the policies underlying my decision to apply the exclusionary rule here would apply only to the punishment with respect to the incarcerative sentence.

Had the district court considered the suppressed evidence in sentencing (as our preceding analysis shows it could properly have done), it could have calculated an offense level based on all the transactions – suppressed and unsuppressed. Prohibiting the court from using this same evidence to calculate restitution would lead to the absurd result that although the defendant could have been serving a sentence based in part on the suppressed offenses, the victims of these offenses would not receive compensation for their losses. Neither Hughey nor the VWPA, whose objective is to compensate a wide class of victims for their losses, could have intended such an outcome.

The record is clear that the district court examined the factors surrounding the charges in the government's letter to the Probation Office listing its requested restitution amounts.

-27-

The letter, prepared from affidavits of actual loss submitted by the victim credit card companies, included the suppressed evidence. Although the letter (and PSR) referred to these transactions as "relevant conduct," the government argues that they fall within the scope of Acosta's criminal conduct in the indictment and further support the contention that the suppressed evidence was conduct that was the basis for the offense of conviction. Acosta did not dispute the accuracy of the amounts in the letter; his objection rested on his argument that the suppressed evidence should not be used to calculate restitution.

As the government points out, the language of the indictment is broad enough to encompass Acosta's criminal conduct of using both the suppressed and unsuppressed credit cards in the ten-month period it covers. See, e.g., United States v. Silkowski, 32 F.3d 682, 689 (2d Cir. 1984) (noting that defendant must pay restitution only for losses "directly caused by conduct within the temporal limits of the offense of conviction"); United States v. Bailey, 975 F.2d 1028, 1033 (4th Cir. 1992) (upholding restitution award to investors not mentioned in indictment and distinguishing Hughey where the offense of "defrauding investors of monies in excess of fifteen million dollars" was "defined broadly in the indictment"); see also United States v. Pepper, 51 F.3d 469, 473 (5th Cir. 1995) (holding the dates specified in the

indictment, along with a description of the unlawful conduct in a scheme or defraud case, were sufficiently specific to satisfy Hughey); United States v. Wise, 990 F.2d 1545, 1548 (10th Cir. 1992) (holding the district court erred in ordering restitution in excess of the specific amount to which the defendant pled guilty); cf. United States v. Akande, 200 F.3d 136, 142-43 (3rd Cir. 1999) (vacating restitution order for losses caused by conduct that fell outside the dates of the offense where the indictment listed the time frame as "on or about December 31, 1997," but the plea agreement and colloquy established that the offense charged did not occur before December 31, 1997); United States v. Hayes, 32 F.3d 171, 172-73 (5th Cir. 1994) (vacating restitution order for losses incurred before the date of the offense of conviction); United States v. Cook, 952 F.2d 1262, 1264-65 (10th Cir. 1991) (vacating restitution order for losses connected to a forty-three count indictment where the defendant pled guilty to only three counts but the district court erroneously construed the language of the plea agreement to find that a guilty plea to one count was effectively a guilty plea to all other counts). The suppressed transactions clearly fell within the description of the offense and the time frame of the conduct of use or attempted use of unauthorized access devices during a ten-month period to which Acosta pled guilty.

To summarize, the district court was not barred from using the suppressed evidence in calculating restitution as part of Acosta's sentence. We are satisfied that the indictment adequately detailed the offense of conviction to enable the district court, in ordering restitution, to consider the suppressed evidence as that underlying the conduct of conviction. We are satisfied that although the district court did not explicitly say it was considering the suppressed evidence conduct of conviction, it did in fact do so and therefore did not err in its restitution calculation. Accordingly, we hold that there was no plain error in the district court's use of the suppressed evidence to calculate restitution.

## III. CONCLUSION

**The district court's calculations of both loss and restitution are AFFIRMED.**