**UNITED STATES of America** Plaintiff–Appellee,

v.

**Troy BILES Defendant–Appellant in 03–5893,**

and

**Jerry BILES Defendant–Appellant in 03–5894.**

No. 03–5893, 03–5894.

United States Court of Appeals, Sixth Circuit.

June 9, 2004.

Tammy Owens Combs, Christopher D. Poole, Asst. U.S. Attorney, U.S. Attorney's Office, Chattanooga, TN, for Plaintiff–Appellee.

Aubrey L. Harper, Harper, Tollison & Burke, McMinnville, TN, for Defendant–Appellant.

Before KRUPANSKY and GILMAN, Circuit Judges; and RUSSELL, District Judge.[*]

RUSSELL, District Judge.

This is the direct appeal of Mr. Jerry Biles and his son, Mr. Troy Biles, from judgments of United States District Court for the Eastern District of Tennessee. Jerry Biles pleaded guilty to three meth-amphetamine-related charges; Troy Biles pleaded guilty to one. Their appeal focuses on a traffic stop and voluntary search of Jerry Biles's truck and a search pursuant to a warrant of Jerry Biles's residence. The defendants allege that the traffic stop and search of the truck violated the Fourth Amendment and that the officers who searched Jerry Biles's residence exceeded the scope of the warrant by also searching a Quonset hut (known as "the shop") next to his home. Troy Biles also appeals the district court's attribution of 5.1 grams of finished methamphetamine to the conspiracy to which he pleaded guilty.

We affirm the judgments of the district court for the reasons given below.

I.

On April 8, 2002, Officers Marc Martin and Jackie Matheny, Jr., members of the Warren County Sheriff's Department, observed Jerry Biles leaving his home in a 1978 brown Dodge pick-up truck. The truck had a fixed camper top with opaque, or heavily-tinted, windows. Officer Martin stopped Jerry Biles after he noticed that one of the truck's brake lights was out and discovered, via radio, that the license plate on the truck was not issued for that truck.

After Jerry Biles got out of his truck. Officer Martin asked him about the broken brake light and the illegal license plate. Biles indicated that the brake light had worked previously and that the license plate was registered to another vehicle he owned. Officer Martin, who testified that he had previously heard information about Biles's connection to illegal drug activity, then asked Jerry Biles if there were any weapons or drugs in the truck. Biles denied that there were: Officer Martin then asked for consent to search the truck. Biles both gave oral consent to search the truck and signed a written consent form.

When the officers searched the vehicle they discovered four opaque garbage bags loaded in the truck bed. These bags had odors similar to those in methamphet-amine laboratories. The officers asked

* Honorable Thomas B. Russell, United States District Judge for the Western District of Ken-   tucky, sitting by designation.

Jerry Biles where the bags came from and he replied that they had come from his residence on Friendship Drive. The officers opened the bags, found the remnants of a methamphetamine lab, and arrested Biles.

Officer Martin took Jerry Biles to jail and sent other officers to Biles's residence to secure it and wait for a search warrant to issue. While at the residence, a group of officers went to the shop adjacent to Biles's home and knocked on its door. They heard movement inside but received no response. They then entered the building, found Troy Biles hiding under a tarp. arrested him, and read him his rights.

The location of the shop is significant because—as explained below—the parties contest whether it is properly understood as a part of the Bileses' homestead or curtilage, or is sufficiently distinct to constitute its own property. The shop sits on a parcel that is taxed separately from Jerry Biles's home. The two buildings—the shop and the residence—are about 150 feet apart and separated about half way by a line of fencing and brush. A fence surrounds most of the shop's lot, which holds scattered cars and other motorized vehicles in various states of disrepair. The shop has its own driveway leading onto Second Street; Biles's house faces Friendship Drive and has its own separate driveway. There is no evidence that the Bileses used the shop for any commercial purposes except manufacturing methamphetamine. Troy Biles lived in the shop at least part of the time.

Officer Martin obtained the following warrant from the state court judge:

> You are therefore hereby commanded to make immediate search on the person of said Jerry Biles and in the Premises used and occupied by him ... located in Warren County. Tennessee and more particularly described as follows:
>
> > Starting at State Hwy 70 and State Hwy 56 in McMinnville, Warren Count TN, travel east on Hwy 70 11.2 miles to the intersection of Hwy 70 and Maple Street in Rock Island TN. Turn left onto Maple Street and travel .2 miles the intersection of Maple Street and 2nd Street. Turn right onto 2nd Street and travel approximately .1 miles to the address of 206 Friendship Drive which will be at the corner of 2nd Street and Friendship Drive. This residence will be on the left-handed side of the road. The house will be a single level house with gray siding and white trim. This will be the residence of Jerry Biles.
>
> This is the premises to be searched including all of the building, out-houses and vehicles found thereof ...

Contrary to the information contained in the warrant, Jerry Biles's house was not on the corner of Second Street and Friendship Drive—it was one house down from that location. The warrant also stated that the house was located in Rock Island when in fact it was located in Campaign.

During the execution of the search warrant. Officer Martin and his fellow officers discovered enough evidence, including material from the shop, to sustain three counts against Jerry and Troy Biles. Those counts included conspiracy to manufacture methamphetamine, possession of methamphetamine with intent to distribute, and possession of precursor materials with the intent to manufacture methamphetamine.[1] The United States District

---

1. A fourth count of the indictment charged Jerry Biles with being a felon in possession of ammunition.

Court for the Eastern District of Tennessee denied motions by Jerry and Troy Biles to suppress evidence gathered during the search of the 1978 Dodge pickup and the residence and shop. The Bileses subsequently accepted plea agreements[2] and were sentenced in June 2003.

At the time of his sentencing Troy Biles objected to the presentence report's attribution to him of 5.1 grams of finished methamphetamine which, he contends, was attributable either to his father, his father's live-in girlfriend, "or other persons engaging in consumption or distribution activities separate and apart from Troy Biles that did not further his conspiracy to manufacture with Jerry Biles." The district court noted this objection but concluded "that it does apply and that the 5.1 grams of methamphetamine were directly attributed to [Troy Biles.]"

Both defendants filed timely notices of appeal.

## II.

"In reviewing a district court's denial of a motion to suppress evidence, this court reviews the district court's findings of fact for clear error, and its legal conclusions de novo." *United States v. Gillis,* 358 F.3d 386, 390 (6th Cir.2004). It is also well-established that "[t]his court reviews for clear error the district court's determination of the quantity of drugs attributable to a defendant for sentencing purposes." *United States v. Dunbar,* 357 F.3d 582, 597 (6th Cir.2004).

The standard of review for the district court's curtilage determination is unsettled. Prior to the late 1990s, most circuits considered "curtilage questions [as] factual determinations" and reviewed them for clear error. *Daughenbaugh v. City of Tiffin,* 150 F.3d 594, 597 (6th Cir.1998) (noting accord among the Second, Third, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits). The cases cited in *Daughenbaugh,* however, did not consider *Ornelas v. United States,* 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), which held that circuits should apply *de novo* review to determinations of reasonable suspicion and probable cause. Applying *Ornelas* to questions of curtilage, the Ninth Circuit recently concluded that appellate courts must review those determinations *de novo,* too. *United States v. Johnson,* 256 F.3d 895, 911–13 (9th Cir. 2001) (en banc). The First Circuit subsequently concluded that questions of curtilage required "clear error review of the district court's factual findings and *de novo* review of the court's legal conclusions." *United States v. Diehl,* 276 F.3d 32, 37 (1st. Cir.2002). Thus, it appears that the First Circuit continues to rely on district courts to determine the actual layout of the residences in question, but then applies *de novo* review to "the [legal] significance of [that] collection of facts." *Id.; see also United States v. Breza,* 308 F.3d 430, 435 (4th Cir.2003) (adopting the First Circuit's analysis).

Although we believe that the above-cited decisions of the First, Fourth, and Ninth Circuits are sound, we are nevertheless bound by *Daughenbaugh,* which was decided two years after *Ornelas. See United States v. Roper,* 266 F.3d 526, 530 (6th Cir.2001)("[A] prior published opinion of this court is binding unless either an *intervening* decision of the United States Supreme Court requires modification of the

**2.** Jerry Biles pleaded guilty to the first three (methamphetamine-related) counts; Troy Biles pleaded guilty to the first count for conspiracy to manufacture methamphet- amine. The United States has dismissed the final count of felon in possession against Jerry Biles and the other charged levied against Troy Biles.

prior opinion or it is overruled by this court sitting in en banc.")(emphasis added); *see also* Sixth Circuit Rule 206(c)(mandating that published opinions of this court are binding upon all subsequent panels). In any event, our decision in the case before us would be the same regardless of which standard of review we applied to the curtilage issue.

### III.

We consider the defendants' challenges in the order that they arose.

*1. Was Investigator Martin's request to search Jerry Biles's truck proper?*

There is no question that Investigator Martin's initial decision to stop Jerry Biles for traffic violations—a broken brake light and mismatched license plates—was proper and protected under *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), which held that traffic stops will not violate the Fourth Amendment so long as the officers have probable cause to believe traffic violations occurred. *See also United States v. Wellman*, 185 F.3d 651, 655 (6th Cir.1999).

The defendants argue that the officers' request to search Jerry Biles's truck exceeded the legitimate purpose of the traffic stop and, because they were unsupported by any reasonable suspicion of illegal activity, unconstitutional. The defendants rely heavily on the rule that "[t]o detain the motorist any longer than is reasonably necessary to issue the traffic citation, however, the officer must have reasonable suspicion that the individual has engaged in more extensive criminal conduct. That is, without such reasonable suspicion, all the officer's actions must be reasonably related in scope to circumstances justifying the original interference." *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir.2002)(quotation marks omitted). This

circuit, however, recently addressed a very similar argument in *United States v. Burton*, 334 F.3d 514 (6th Cir.2003). In *Burton*, the traffic violation triggering the stop occurred in a high crime area at 11:30 at night after the arresting officer received reports of narcotics sales and observed two men getting into the back of a parked car and remaining there. *Id.* at 515. The court concluded that under those circumstances "asking a few questions about illegal activity to a driver of an automobile stopped for a traffic violation at 11:30 pm is not unreasonable." *Id.* at 519. *Burton* relied on *United States v. Erwin*, 155 F.3d 818 (6th Cir.1998) (en banc), and *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). *Robinette* established that "the Fourth Amendment required only that the detention and question be reasonable under the particular facts of the case." *Burton*, 334 F.3d at 517 (citing *Robinette*, 519 U.S. at 39, 117 S.Ct. 417). *Erwin* concluded that " 'irrespective of whether the deputies were justified in detaining [the motorist] after he showed no signs of intoxication, and even if they had not, after approaching [the motorist], observed conditions raising a reasonable and articulable suspicion that criminal activity was 'afoot,' they were entitled to ask [the motorist] for permission to search his vehicle.' " *Burton*, 334 F.3d at 519 (quoting *Erwin*, 155 F.3d at 822–23).

Here the circumstances surrounding the initial traffic stop were much less suspicious than those in *Burton*. Officers Martin and Matheny may or may not have had knowledge of Jerry Biles's criminal record and suspicions based on "information from other officers" that he was presently attempting to manufacture methamphetamine. In any event, the test courts must apply is not one of reasonable suspicion but one of reasonableness under the circumstances. *See Robinette, supra.* As

this circuit noted in *Burton*, the Seventh Circuit has written:

> Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention. They do not signal or facilitate oppressive police tactics that may burden the public—for all suspects (even the guilty ones) may protect themselves fully by declining to answer. Nor do the questions forcibly invade any privacy interest or extract information without the suspects' consent.

*Burton*, 334 F.3d at 518 (citing *United States v. Childs*, 277 F.3d 947, 954 (7th Cir.2002) (en banc)). Officer Martin asked Jerry Biles if the truck contained weapons or drugs—and for permission to search it—in the course of a legitimate traffic stop and did not threaten retaliation for refusing to answer the questions or give consent to the search. Under these circumstances, such requests are reasonable.

*2. Did the district court clearly err in determining that Jerry Biles had voluntarily consented to the search of his truck?*

The question of whether or not Jerry Biles's consent to search his truck is one of fact and therefore the district court's conclusions must be reviewed only for clear error. *See United States v. Yang*, 281 F.3d 534, 548 (6th Cir.2002). The district court concluded that Jerry Biles had given voluntary and informed consent to search his truck, based on his statements and his decision to sign the consent to search form.

■ The defendants argue that both Officer Martin's question about drugs and guns and his request for consent to search the car were unfounded and inherently coercive. They base this argument on the assumption that Jerry Biles's refusal to answer the question or give consent to search his truck—which he was clearly entitled to do—would have "as a practical matter" resulted in a longer detention by the officers. The facts do not support the defendants' argument.

In determining whether the consent given was voluntary.

> the court should examine, inter alia, the following factors: the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent: whether the individual understands his or her constitutional rights: the length and nature of detention; and the use of coercive or punishing conduct by the police.

*United States v. Worley*, 193 F.3d 380, 386 (6th Cir.1999) (citations and quotations omitted). Here Jerry Biles is of proper age, intelligence and education to understand his rights; there is no evidence that he did not understand those rights; the traffic stop was quite short; and, there is no evidence that Officers Martin and Matheny threatened, coerced, or in any way rendered Biles's consent involuntary. Therefore, the district court did not clearly err in deciding that Biles voluntarily consented.

*3. Did the search warrant issued adequately describe the places to be searched?*

■ As noted previously, the search warrant issued did not describe Jerry Biles's residence with complete accuracy. It placed the house in the wrong city and described it as being on the corner of 2nd Street and Friendship Drive when in fact it was one house in from the corner. The defendants argue that these mistakes indicate that the warrant did not meet the Fourth Amendment's requirement that "warrants ... particularly describe the place to be searched." *United States v.*

*King,* 227 F.3d 732, 750 (6th Cir.2000) (citation and quotation marks omitted). There is "a two-part test for determining whether a description in a warrant is sufficient to satisfy the particularity requirement: (1) whether the place to be searched is described with sufficient particularity as to enable the executing officers to locate and identify the premises with reasonable effort; and (2) whether there is reasonable probability that some other premises may be mistakenly searched." *King,* 227 F.3d at 750 (citations and quotations omitted). The district court relied on *United States v. Durk,* 149 F.3d 464 (6th Cir.1998), in determining that the warrant was sufficient despite its inaccuracies.

This reliance was well-placed. In *Durk,* the warrant inaccurately described the house to be searched as "4612 Grandview" instead of "4216 Grandview," and placed it three houses east of Grandview instead of three houses west. *Id.* at 465. The warrant also contained accurate information describing the house—describing it as a "single family red brick ranch home" with a metal storage shed adjoining it—and incorporated an affidavit specifically identifying the owner of the home and the resident whose room the officers wished to search. *Id.* at 464–65. The court concluded that the warrant satisfied the Fourth Amendment's purposes because circumstances made it "clear that the inaccuracies in the warrant here would not lead to a mistaken search of other premises." *Id.* at 466. Here, the warrant adequately described Jerry Biles's house, its location relative to other identifiable landmarks, and its owner, i.e., Jerry Biles. The officers easily identified the property in question, both from the overall description and from their prior knowledge, and there was no probability that any other property would be mistakenly searched. Therefore, the warrant adequately described the places to be searched.

*4. Did the officers exceed the scope of the search warrant?*

◼ The defendants argue that the warrant did not include the shop behind Mr. Jerry Biles's house and that the shop was not within the curtilage of the residence. Generally, "a warrant for the search of a specified residence or premises authorizes the search of auxiliary and outbuildings within the curtilage." *United States v. Watkins,* 179 F.3d 489, 505 (6th Cir.1999) (Boggs, J., concurring) (collecting cases); *see also United States v. Campbell,* 256 F.3d 381 (6th Cir.2001) (holding that "since all of the buildings at 8670 Jennings Drive were within the curtilage of the property, there was no need to demonstrate probable cause to search each building on the property,"); *United States v. Alexander,* 761 F.2d 1294, 1300–02 (9th Cir.1985)(holding that a warrant commanding search of "all buildings, outbuildings, garages, yard areas, trash containers, storage areas and containers used in connection with or within the curtilage of said premises and buildings" could include every structure on a 40–acre ranch). The warrant does not describe the shop; it refers only to the residence, "out-houses and vehicles found thereof." The question of whether the shop is an "out-house" within the meaning of the warrant is essentially the same as whether the shop is a part of the residence's curtilage. Therefore, the relevant question is whether the shop falls within the curtilage of Jerry Biles's home.

The Supreme Court has identified four factors that courts must consider in determining whether or not a structure falls within the curtilage of the home.

> Drawing upon the Court's own cases and the cumulative experience of the lower courts that have grappled with

the task of defining the extent of a home's curtilage, we believe that curtilage questions should be resolved with particular reference to four factors: [1] the proximity of the area claimed to be curtilage to the home, ▮ whether the area is included within an enclosure surrounding the home, ▮ the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn,* 480 U.S. 294, 300–01, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987).

To review those four factors as applied to the facts of this case: 1) the shop was approximately 150 feet behind Jerry Biles's home; 2) it was surrounded by at least a partial fence or brush line which separated it from the house; 3) it was used, apparently, as a hobby barn and for odd repair jobs, as well as a sometime residence for Troy Biles; 4) the Bileses made no effort to conceal it. The district court noted that "[i]t is also significant that Troy Biles thought of the house and the shop as being one residence. When he claimed to live in the shop. he listed 206 Friendship Drive as his address and took showers at the house."

In *Dunn* itself, the Supreme Court determined that the barn in question lay outside the home's curtilage. First, the barn was 150 feet from the fence surrounding the house and 180 feet from the house itself. 480 U.S. at 302, 107 S.Ct. 1134. Second, the Court found it significant that the barn sat outside the fence surrounding the home. *Id.* Third, the Court noted that there was no evidence that the barn was used for activities "so associated with the activities and privacies of domestic life that the officers should have deemed the barn as part of respondent's home." *Id.* at 303, 107 S.Ct. 1134.

Finally, the Court noted that the fence used to surround part of the barn was "designed and constructed to corral livestock, not to prevent persons from observing what lay inside the enclosed areas." *Id.*

In *United States v. Bennett,* 170 F.3d 632, 638 (6th Cir.1999), this court found that the warrant included within its scope a detached shop building even though the warrant and the affidavit did not identify the shop itself as a place to be searched. *Id.* at 637–38. The shop building in *Bennett* stood approximately 60 to 100 feet apart from the residence. *Id.* at 638. Without further discussion of the layout, the court concluded that "the shop building and residence are, for all practical purposes, one single location because the outbuilding is within the curtilage of the 'premises' for which the search warrant was issued. Accordingly, we find that the search of the outbuilding did not exceed the scope of the search warrant." *Id.* at 639. The *Bennett* court commented:

We note that when examining the legitimacy of search warrants, we are to follow a commonsensical and practical approach, as opposed to an overly technical review. *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). The warrant in this case, like the warrant issued in Fine, authorized a search of "the premises known and numbered as 792 Goshen–Church Road...." This is certainly broad enough to include a shop building located in the curtilage of the property and which is, at most, 100 feet away from the residence. *See also United States v. Earls,* 42 F.3d 1321, 1327 (10th Cir.1994)(finding that a detached garage, shed and office are the type of buildings which are typically part of residential property, such that a warrant authorizing a search of the premises also

permitted a search of these outbuildings located within the curtilage of the residence); *United States v. Combs,* 468 F.2d 1390 (6th Cir.1972)(finding that where contraband was discovered in a residence pursuant to a valid search warrant, there was also probable cause to search an automobile located on the premises and situated close enough to the residence to be considered within the curtilage).

170 F.3d at 639 (some citations omitted).

The defendants rely heavily on *United States v. King,* 227 F.3d 732 (6th Cir.2000). At issue in *King* was a search warrant for the " 'premises, curtilage, containers, and persons therein' at a location described as '1437 East 116th Street, Cleveland, Cuyahoga County, Ohio, and being more fully described as the downstairs unit in a two-family, two and one half story, white wood [-]sided dwelling with green trim.' " *Id.* at 737. The renters of this unit also had access, via an outside hallway, to a basement storage unit. There was no direct access from the apartment to the storage unit. *Id.* at 737–38. Officers executing the warrant in question searched not only the apartment described but the basement storage unit and discovered in the latter a large quantity of crack cocaine.

The court concluded that suppression was necessary because the description of "premises [and] curtilage" did not extend to the basement storage unit. *Id.* at 752–53. Relying on somewhat formalistic reasoning, the court distinguished curtilage as the "land adjoining the house" or a "yard" and decided that had the district court or its predecessor panel considered the basement "curtilage" it would have analyzed the case differently. *Id.* at 752–53. The conclusion that the home's basement, even a two-family home, is not a part of that residence's curtilage is not particularly helpful in analyzing the facts at hand.

It is clear that at least Troy Biles considered the shop a part of the house's curtilage and that Officer Martin believed that his warrant to search Jerry Biles's residence included the shop. The question is a close one based on *Dunn* itself. The Biles's shop is almost as far removed from their home as the barn the Supreme Court considered in *Dunn*—150 versus 180 feet. *But see Dow Chem. Co. v. United States by and through Buford,* 749 F.2d 307, 313–14 (6th Cir.1984) ("It is true that certain outside areas associated with a home or dwelling have traditionally received Fourth Amendment protection as falling within the 'curtilage.' Thus, the Fourth Amendment has been held to apply to the search of a smokehouse located within a fenced yard and to a honeysuckle patch situated within a fence 150 feet from a home.") (citations omitted). Also. like *Dunn,* here there is at least some indication from brush and fencing that the two buildings— the Bileses' house and the shop—are distinct.

On the other hand, the Bileses's shop was used, at least intermittently, as a residence and there was at least as much effort to protect it from outside scrutiny as there was the house itself. These two factors, combined with the defendants' own views of the shop as part of the same residence, leads us to conclude that the shop stood inside the curtilage of the house and therefore was subject to the warrant.

■ Even if the officers who searched the shop exceeded the scope of the warrant, however, exclusion is improper because the officers conducted the search in good faith.

It is well established that the Fourth Amendment exclusionary rule does not apply in cases where law enforcement officers reasonably rely in good faith

upon a search warrant, even if that warrant is ultimately found to be invalid. Nevertheless, this good-faith exception to the exclusionary rule established in *Leon* does not apply when 1) the supporting affidavit contained knowing or reckless falsity, 2) the issuing magistrate failed to act in a neutral and detached fashion and served merely as a rubber stamp for the police; 3) the supporting affidavit did not provide the magistrate with a substantial basis for determining the existence of probable cause: or 4) the officer's reliance on the warrant was neither in good faith nor objectively reasonable.

*United States v. Hammond,* 351 F.3d 765, 773–74 (6th Cir.2003) (citations omitted).

Here none of the first three exceptions to the *Leon* rule apply: 1) there is no evidence that any part of the affidavit was untrue; 2) there is no hint of bias on the part of the issuing judge; and 3) the affidavit confirms the finding that probable cause existed. The question turns on whether it was objectively reasonable or not for Officer Martin to believe that the shop structure was a part of the curtilage of Jerry Biles's residence, or whether it was covered by the warrant's command to search "all of the building, out-houses and vehicles found thereof."

The defendants suggest that "there is no precedent for the affiant's 'intentions' being permitted to expand the scope of the warrant beyond what the hearing magistrate concluded was the proper place to search." However, other courts have found, at least in passing, that the *Leon* exception may save a search that exceeds the scope of a warrant if officers reasonably mistake what may be found within a home's curtilage. *See, e.g., United States v. Gorman,* 104 F.3d 272, 275–76 (9th Cir. 1996); *United States v. Earls,* 42 F.3d 1321 (10th Cir.1994); *United States v. Asselin,* 775 F.2d 445 (1st Cir.1985).

The question of whether or not a particular outbuilding is a part of a residence's curtilage is a question of law and here it is a very close one. As a result, *Leon* should apply. There is no evidence of bad faith on the part of Officer Martin—indeed, his testimony reflects just the opposite—and the search of the shop was not objectively unreasonable. Therefore, we conclude that even if the officers exceeded the scope of the warrant the exclusionary rule should not apply.

*5. Should the exclusionary rule apply to sentencing hearings?*

The defendants urge this panel to overrule *United States v. Jenkins,* 4 F.3d 1338 (6th Cir.1993), and conclude that the Fourth Amendment's exclusionary rule applies to sentencing hearings. The basis for this request is the Supreme Court's decision in *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), which held that the *Miranda* warnings were constitutionally required and therefore not subject to the Congress's attempts to limit their use.

We will not honor the defendants' request. First, as explained above, there were no Fourth Amendment violations that would normally trigger the use of the exclusionary rule, which make this case an inopportune time to consider the issue. Second, other circuits that have considered this issue, both before and after the Court handed down *Dickerson,* have found that the exclusionary rule does not apply to sentencing hearings. *See, e.g., United States v. Acosta,* 303 F.3d 78, 84–86 (1st Cir.2002)(collecting cases). There is no evidence that *Dickerson* has worked—or was meant—to displace the long-held view that the exclusionary rule is "a judicially created remedy designed to safeguard Fourth

Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

### 6. Did the district court improperly include 5.1 grams in Troy Biles's offense level calculation?

■ The final error alleged by Troy Biles is that the district court improperly attributed to him 5.1 grams of finished methamphetamine as relevant conduct to the Bileses' conspiracy to manufacture methamphetamine. U.S.S.G. § 1B1.3 (2002) provides that "in the case of a jointly undertaken criminal activity" (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense. U.S.S.G. § 1B1.3(a)(1)(B) (2002). The district court's determination stands unless "we conclude that the determination is clearly erroneous." *United States v. Burns,* 298 F.3d 523, 545 (6th Cir.2002).

Troy Biles argues that he is not responsible for that 5.1 grams of finished product because he never successfully completed a "cook" to produce methamphetamine. As noted in *Burns,* "[a] coconspirator is not necessarily responsible for the total amount of cocaine involved in the conspiracy for the purposes of establishing his base offense level. Rather, a participant is responsible for other conspirators' conduct only if [1] that conduct was reasonably foreseeable to him and [2] in furtherance of the execution of the jointly undertaken

criminal activity." *Burns,* 298 F.3d at 545 (quoting *United States v. Jenkins,* 4 F.3d 1338, 1346 (6th Cir.1993)).

Here Troy Biles cannot argue that the possession of finished methamphetamine was unforeseeable given that the entire purpose of the conspiracy for which he was charged was manufacturing methamphetamine. Also, Troy Biles admitted that he and his father used methamphetamine "when we are working and need to stay up." It reasonably follows that this use is in furtherance of the attempts to cook methamphetamine. The district court acknowledged this objection and noted that it had reviewed the pre-sentence report and agreed with the conclusion that the methamphetamine was fairly attributable to Tory Biles. This finding is reasonable in light of the record. *See United States v. Bartholomew,* 310 F.3d 912, 923 (6th Cir.2002) ("The test is whether there is evidence in the record to support the lower court's finding, and whether its construction of that evidence is a reasonable one.")(quoting *Heights Cmty. Congress v. Hilltop Realty, Inc.,* 774 F.2d 135, 140 (6th Cir.1985)).

## IV.

For the reasons given above, we affirm the district court's judgments in all respects.